Opinion for the Court filed by Circuit Judge KAVANAUGH, with whom Circuit Judge GRIFFITH joins.
Dissenting opinion filed by Circuit Judge PILLARD.
KAVANAUGH, Circuit Judge:
This case concerns the Food and Drug Administration’s regulation—and subsequent re-regulation—of a medical device called the Collagen Scaffold, an absorbable surgical mesh that is designed for use in knee-replacement surgeries. In December 2008, the manufacturer of the scaffold, ReGen Biologies, obtained FDA clearance to market the device. FDA’s clearance of the scaffold soon came under fire in the press and from some Members of Congress amid allegations that the process had been tainted by improper political pressure from other Members of Congress. An internal FDA investigation concluded that some procedural irregularities had occurred during the agency’s review of the device.
Following the internal investigation, FDA did not exercise its clear statutory authority to reclassify the device. Reclassification would force the device off the market and require the device to undergo the extensive pre-market approval process before it could again be marketed. That statutory reclassification process generally requires FDA to provide notice and an opportunity for comment before the agency reclassifies a device. FDA here did not give notice and opportunity for comment. Rather, FDA short-circuited the statutory reclassification process by relying on what it called its inherent reconsideration authority. Asserting that inherent authority, FDA reevaluated the scaffold and concluded that the agency had erred in allowing the device to be sold. FDA issued an order rescinding its clearance decision, forcing ReGen to immediately pull the scaffold from the market. ReGen subsequently filed for bankruptcy.
ReGen and its successor in interest, Ivy Sports Medicine, challenged FDA’s decision to rescind the clearance determination as procedurally flawed. The District Court granted summary judgment to FDA, and Ivy now appeals. Because we conclude that FDA did not follow the proper statutory procedure for reclassifying a *83 device, we reverse the judgment of the District Court. We direct the District Court to vacate FDA’s decision and to remand to the agency for further proceedings.
I
A
In 1976, Congress amended the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., to grant FDA authority to regulate medical devices intended for human use. Devices fall into one of three categories— Class I, Class II, or Class III. A device’s classification is determined based on “the degree of regulation thought necessary to provide reasonable assurance of each device’s ‘safety and effectiveness.’” Contact Lens Manufacturers Association v. FDA 766 F.2d 592, 594 (D.C.Cir.1985).
The classification of a device matters because the three classes trigger different approval processes. In order to enter the market, manufacturers of Class III devices first must go through the “premarket approval” process. “That process generally requires extensive clinical research on a new device to ensure the device’s safety, and it often takes significant time.” Cyto-ri Therapeutics, Inc. v. FDA 715 F.3d 922, 923 (D.C.Cir.2013). Class I and II devices are considered to pose fewer risks and are therefore able to enter the market more easily. Rather than requiring pre-market approval, Class I and II devices are subject either to “general controls” such as labeling restrictions (for Class I devices), or a combination of general controls and “special controls,” such as performance standards (for Class II devices). See 21 U.S.C. § 360c(a)(l)(A)(i), (a)(1)(B).
How does a device initially get classified into Class I, II, or III? The Act makes Class III the default category for new (that is, post-1976) medical devices, unless and until FDA finds that one of two conditions has been met. See id. § 360c(f)(l). First, FDA may determine that a device is “substantially equivalent” to a pre-existing Class I or II device. Id. § 360c(f)(l)(A)(ii). To be substantially equivalent to a preexisting Class I or II device, the new device must have “the same intended use as the predicate device,” and either (i) have “the same technological characteristics as the predicate device” or (ii) be shown to be as safe and effective as the predicate device. Id. § 360c(i)(l)(A). Second, regardless of whether a device is substantially equivalent to an existing device, FDA may make a de novo determination that a device meets the statutory definitions of Class I or II. See id. § 360c(f)(l)(B), (f)(2)—(3). That determination may be made on FDA’s own initiative or in response to the device manufacturer’s petition for de novo classification.
Here is how it works in practice: Classification of a new medical device into Class I or II is usually obtained by submitting to FDA a “premarket notification,” which in turn triggers the FDA’s substantial equivalence review. See id. § 360(k). In the pre-market notification, the manufacturer states the new device’s intended use, identifies the predicate devices to which the new device is substantially equivalent, and offers a proposed classification. See id.; 21 C.F.R. § 807.87. If FDA agrees that the new device is substantially equivalent to an existing Class I or Class II device, it issues a classification order allowing the device to be marketed subject to appropriate restrictions. See 21 C.F.R. § 807.100. But if FDA disagrees with the proposed classification, the device remains in Class III and must go through the pre-market approval process, unless FDA subsequently approves a petition for de novo classification. See 21 U.S.C. § 360c(f)(3)(A).
*84 After a device has been initially classified, there is also a process for FDA reclassification. The Act includes a provision, Section 360c(e), allowing FDA to change the classification given to a device. See 21 U.S.C. § 360c(e). During the time period relevant to this litigation, that provision stated: “Based on new information respecting a device, the Secretary may, upon his own initiative or upon petition of an interested person, by regulation (A) change such device’s classification, and (B) revoke, because of the change in classification, any regulation or requirement in effect ... with respect to such device.” Id. § 360c(e)(l) (2011). Because reclassification must be done “by regulation,” it must be done in accord with certain procedural requirements, including notice and comment. See FDA Br. 36; 21 U.S.C. § 360c(e); 21 C.F.R. § 860.130(c).
B
ReGen Biologies, Inc. was a New Jersey-based medical device manufacturer. In 1993, ReGen began research on a new device for use in certain knee-repair surgeries. The fruit of that labor, called the Collagen Scaffold, is a crescent-shaped surgical mesh made of bovine collagen. According to ReGen, the Collagen Scaffold was intended to reinforce and repair the knee cartilage remaining after knee surgery and to provide a scaffold on which new tissue could grow.
In 2004, ReGen submitted a Class III premarket approval application but subsequently withdrew it and sought to proceed through the quicker premarket notification process for Class I or Class II devices. In 2005, ReGen submitted to FDA its first pre-market notification for the Collagen Scaffold. Shortly thereafter, FDA issued a letter finding that the scaffold was not substantially equivalent to its claimed predicates. FDA eventually agreed to convert that finding into a request for additional information. After receiving the requested information, FDA again determined that the scaffold was not substantially equivalent.
In late 2006, ReGen submitted a second pre-market notification with revised labeling. Following more back-and-forth between ReGen and FDA, the agency issued another finding that the Collagen Scaffold was not substantially equivalent to existing devices. A few months after this second decision, four members of New Jersey’s congressional delegation wrote to the FDA Commissioner expressing concern about FDA’s process for reviewing the scaffold. Representatives from ReGen later met with the Commissioner and with Dr. Daniel Schultz, the director of FDA’s Center for Devices and Radiological Health, the office that oversees device approval decisions. Although the FDA officials declined to take further action on the denied application, Dr. Schultz advised ReGen that it could submit a new pre-market notification with additional revisions.
ReGen took Dr. Schultz up on his suggestion and submitted a third pre-market notification in July 2008. As they had before, FDA’s staff reviewers recommended that the scaffold be found not substantially equivalent to the claimed predicates. Rather than issue a final decision, however, Dr. Schultz decided to convene and seek input from an expert advisory panel. That panel ultimately concluded that the scaffold “was as safe and effective as the predicate devices.” pood & Drug Administration, Orthopaedic and Rehabilitation Devices Panel Meeting—November 14, 2008 (Summary). Based on the panel’s conclusions and other information in the administrative record, Dr. Schultz issued a letter finding that ReGen had demonstrated substantial equivalence and classifying the Collagen Scaffold into Class II.
*85 ReGen’s victory would prove short-lived. A few months after ReGen received clearance to market the Collagen Scaffold, the Wall Street Journal published an article alleging that political pressure had skewed FDA’s review process. See Alicia Mundy, Political Lobbying Drove FDA Process, WALL ST. J., Mar. 6, 2009, at Al. The same day that the Wall Street Journal article appeared, a United States Senator contacted FDA to raise concerns that Re-Gen had been allowed to play an outsized and inappropriate role in the process. Other Members of Congress later raised similar concerns. And in April 2009, at the same time ReGen was preparing for its first commercial distributions of the scaffold in the United States, a group of FDA employees wrote a letter to President Obama accusing Dr. Schultz and the FDA Commissioner of improperly influencing the results of the agency’s review.
Faced with those and other allegations of impropriety, FDA’s newly appointed Acting Commissioner ordered an internal investigation of the Collagen Scaffold’s review process. The investigation culminated in a report issued in September 2009. See Food & Drug Administration, Review of the Regen Menaflex: Departures from Processes, Procedures, and Practices Leave the Basis for a Review Decision in Question, Preliminary Report (2009). The report identified “multiple departures from processes, procedures, and practices” that raised “serious questions about whether the integrity (as well as the quality) of the review process was compromised.” Id. at 1, 22. Among other things, the report criticized ReGen’s access to high-level FDA officials, and those officials’ involvement in the decisionmaking process; communications between Members of Congress and the FDA Commissioner; and ReGen’s level of involvement in the expert panel proceedings. Although the report stopped short of concluding that the review process had been compromised, it recommended reevaluation of Dr. Schultz’s decision to clear the Collagen Scaffold. Id. at 23.
Following the report’s publication, FDA appointed a new team to review the Collagen Scaffold. That team concluded that the device was not substantially equivalent to its claimed predicates. Dr. Jeffrey Shu-ren, who had succeeded Dr. Schultz as head of FDA’s Center for Devices and Radiological Health, then convened a second expert panel. The second panel’s findings were mixed; although the scaffold was “generally considered safe,” the panel members raised “some concerns about efficacy.” J.A. 1020. In October 2010, Dr. Shuren notified ReGen that the clearance of the scaffold “was in error,” and that to “rectify this error” FDA would rescind its substantial equivalence determination. Letter from Dr. Jeffrey Shuren, Director, Center for Devices and Radiological Health, to Dr. Gerald E. Bisbee, Jr., Chairman and Chief Executive Officer, Re-Gen Biologies, Inc. (Oct. 14, 2010). That decision, in turn, meant that the Collagen Scaffold would be in Class III and have to go through the extensive pre-market approval process to be marketed again. An official rescission order followed in March 2011, forcing ReGen to withdraw the Collagen Scaffold from the market.
ReGen then filed this suit in the District Court seeking review of FDA’s decision pursuant to the Administrative Procedure Act. See 5 U.S.C. § 702. During the pen-dency of the case, ReGen went bankrupt and Ivy Sports Medicine, LLC became the successor in interest to ReGen and was substituted as plaintiff.
Before the District Court, Ivy argued that FDA’s rescission order was unlawful. Of relevance here, Ivy asserted that FDA did not have inherent authority to rescind *86 its substantial equivalence determination; rather, according to Ivy, FDA should have exercised its statutory reclassification authority if it wanted to change the original classification decision. The District Court disagreed and granted summary judgment to FDA. Our review of the District Court’s decision is de novo. See Virginia Department of Medical Assistance Services v. HHS, 678 F.3d 918, 921 (D.C.Cir.2012).
II
FDA asserts that it had “inherent authority” to rescind its determination that the Collagen Scaffold was substantially equivalent to devices already in the market. Rescinding that determination had the effect of putting the device into Class III, and thus required completion of the extensive pre-market approval process before the scaffold could be marketed again. FDA used its inherent authority to rescind rather than its statutory reclassification authority. As a result, FDA did not go through the procedures—including notice and comment—that are required for reclassification.
The Act does not contain an express provision granting FDA authority to reconsider its substantial equivalence determinations. But as FDA notes, administrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion. See, e.g., American Methyl Corp. v. EPA, 749 F.2d 826, 835 (D.C.Cir.1984) (“We have held that agencies have an inherent power to correct their mistakes by reconsidering their decisions within the period available for taking an appeal.”); Mazaleski v. Treusdell, 562 F.2d 701, 720 (D.C.Cir.1977) (“We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time.”) (quoting Gratehouse v. United States, 206 Ct.Cl. 288, 512 F.2d 1104, 1109 (1975)); Albertson v. FCC, 182 F.2d 397, 399 (D.C.Cir.1950) (“in the absence of any specific limitation,” reconsideration available “within the period for taking an appeal”); see generally Daniel Bress, Note, Administrative Reconsideration, 91 VA. L. REV. 1737 (2005). As this Court explained in an oft-repeated framing of the principle, inherent authority for timely administrative reconsideration is premised on the notion that the “power to reconsider is inherent in the power to decide.” Albertson, 182 F.2d at 399.
But we have also recognized that any inherent reconsideration authority does not apply in cases where Congress has spoken. In American Methyl Corp. v. EPA, 749 F.2d 826 (D.C.Cir.1984), we held that an agency may not rely on inherent reconsideration authority “when Congress has provided a mechanism capable of rectifying mistaken actions.” 749 F.2d at 835. In such circumstances, we concluded, “it is not reasonable to infer authority to reconsider agency action.” Id.; see also New Jersey v. EPA 517 F.3d 574, 583 (D.C.Cir.2008) (“Congress ... undoubtedly can limit an agency’s discretion to reverse itself’). Put more simply, our cases assume that Congress intends to displace an administrative agency’s inherent reconsideration authority when it provides statutory authority to rectify the agency’s mistakes.
Ivy argues that this case falls squarely within the ambit of cases like American Methyl. In particular, Ivy contends that Congress precluded FDA from exercising inherent authority to rescind substantial equivalence determinations by creating in 21 U.S.C. § 360e(e) a specific statutory mechanism to correct alleged device classification errors. As relevant here, that provision states: “Based on new information respecting a device, the Secretary may, upon his own initiative or upon peti *87 tion of an interested person, by regulation (A) change such device’s classification, and (B) revoke, because of the change in classification, any regulation or requirement in effect under section 360d or 360e of this title with respect to such device.” 21 U.S.C. § 360c(e)(l) (2011). To do so, the agency must first give notice and opportunity for comment. See FDA Br. 36; 21 U.S.C. § 360c(e); 21 C.F.R. § 860.130(c).
For its part, FDA acknowledges that it could have used the statutory reclassification procedure in Section 360c(e) to reclassify the Collagen Scaffold into Class III and thereby remove it from the market. See FDA Br. 39. But FDA argues that nothing in the Act or the American Methyl line of cases bars the agency from relying on its inherent reconsideration authority for the underlying substantial equivalence determination. In FDA’s view, Ivy is conflating the underlying substantial equivalence determination with the potential consequence of that decision— classification into Class I, II, or III.
Although counsel for FDA has advanced a forceful case for the agency’s position, we ultimately think that Ivy has the better of the argument. It may well be correct, as FDA contends, that the statutory procedures outlined in Sections 360c(f) (for determining substantial equivalence) and 360c(e) (for reclassification) are not mirror images of one another. But the fundamental question both provisions address— what is the appropriate classification of a new device?—is the same. And as a practical matter, the decision to revoke a substantial equivalence determination in circumstances like those present here is a de facto reclassification of the device into Class III, at least absent other FDA action. If FDA finds that a device is no longer substantially equivalent to any existing Class I or Class II devices, that device is automatically reclassified as a Class III device. In other words, to revoke a substantial equivalence determination is to “change the classification,” 21 U.S.C. § 360c(e)(2), of that device.
FDA’s statutory reclassification authority covers the same concerns, and achieves the same result, as revocation of a substantial equivalence determination. Therefore, as in American Methyl, “Congress has provided a mechanism capable of rectifying mistaken actions,” and it would be unreasonable under this statutory scheme to infer that FDA retains inherent authority to short-circuit or end-run the carefully prescribed statutory reclassification process in order to correct the same mistake. Indeed, accepting FDA’s assertion of inherent authority would render Section 360e(e) a dead letter in many cases because FDA could often reclassify a device without complying with the procedural requirements of that provision, in particular notice and comment.
In short, because FDA concededly could have used Section 360c(e) to reclassify the Collagen Scaffold into Class III, it could not rely on a claimed inherent reconsideration authority to short-circuit that statutory process and revoke its prior substantial equivalence determination to achieve that same result.
The practical significance of our holding on this point is limited but important. To reclassify under the statute, FDA must go through certain procedural hoops, including notice and comment. See FDA Br. 36. FDA obviously thinks notice and comment is unnecessary here, a not-uncommon sentiment among agencies that want to take action more promptly. But notice and comment helps to prevent mistakes, because agencies receive more input and information before they make a final decision. And notice and comment also helps ensure that regulated parties receive fair treatment, a value basic to American ad *88 ministrative law. So notice and comment, while somewhat burdensome, serves important purposes both generally and in this statute.[1]
Ill
FDA responds that even if Section 360c(e) is the kind of statutory provision that can displace inherent reconsideration authority, the American Methyl principle still would not apply on the particular facts of this case. American Methyl held that EPA had erred by failing to use the statutory procedure for revoking fuel-marketing waivers. But in a footnote, the Court also stated that it was not expressing any view “as to EPA’s power to revoke a waiver obtained through fraud, ex parte contacts, or other misconduct tainting the original record and thereby affecting the integrity of an agency’s proceedings.” 749 F.2d at 834 n. 51. The Court went on to note that in the case before it there was no evidence of such fraud or misconduct in the administrative record. Id.
Here, FDA argues that the findings of its internal investigation—political pressure, agency acquiescence to that pressure, and departures from standard agency procedures—are the kinds of concerns that American Methyl contemplated could warrant reconsideration on the basis of inherent authority even if a statutory reconsideration provision exists.
FDA overreads American Methyl. To begin with, it is not clear that American Methyl’s statements regarding the implications of misconduct are anything more than dicta. As FDA itself points out, the record in American Methyl contained no evidence of misconduct. The Court therefore had no occasion to consider whether a finding of misconduct would allow an agency to use inherent authority—rather than statutory authority—to reconsider a decision. Indeed, the Court explicitly stated that it “of course intimate[d] no view” on the subject. Id.; see also id. at 835 n. 55 (fraud allegations “an issue not before us today and on which we venture no opinion”). Given its ambiguous precedential value, we are hesitant to bind ourselves to American Methyl’s supposed misconduct exception. Cf. Empresa Cubana Exportadora de Alimentos y Productos Varios v. Department of Treasury, 638 F.3d 794, 802 (D.C.Cir.2011) (where footnote was arguably dicta, Court would “decline to elevate it now to a holding”).
In any event, it is unnecessary to decide today whether to recognize that American Methyl exception. Even accepting that American Methyl’s footnote 51 created an exception for misconduct, that exception poses a high bar and would not apply in this case. To state the obvious, not every wrong decision or ill-considered decision is tainted by misconduct. The term “misconduct” as used in American Methyl connotes some clear legal or ethical violation. Here, the record indicates that the review process for the Collagen Scaffold was perhaps imperfect, but the supposed mistakes do not rise to the level of misconduct contemplated by American Methyl. For example, FDA’s report on the scaffold’s review process acknowledged that communications between members of the New Jersey congressional *89 delegation and FDA officials were “not inappropriate.” J.A. 850. And in fact, representing the interests of constituents is a key and proper part of the job of Representatives and Senators. Indeed, FDA received pressure from other Members of Congress to change the original reclassification decision. Not surprisingly, therefore, Members of Congress were on both sides of the question. The Members’ expression of their views—on both sides— was not misconduct for purposes of the American Methyl exception.
Similarly, while the report identified mistakes in the expert panel proceedings, the report found no evidence that those supposed defects affected FDA’s decision. See FDA PRELIMINARY Report 20-21 (consequences of excluding review team members were “speculative” and panel transcript “does not provide adequate support for a conclusion that the integrity of the process was compromised”).[2]
It is also notable that no senior leaders of FDA, executives of ReGen, or Members of Congress were disciplined for their involvement in the scaffold’s review process. Yet if FDA actually rendered a decision tainted by misconduct—as opposed to simply reaching a mistaken decision or a decision it no longer agrees with—that misconduct must have been due to the legally or ethically wrongful actions of some person or persons. FDA’s inability or unwillingness to identify those wrongdoers is an indication that, in fact, no American Methyl-level misconduct occurred, at least on the record before us.
Because Congress created a procedure for FDA to reclassify medical devices, FDA may not short-circuit that process through what it calls its inherent authority to reverse its substantial equivalence determinations for those devices. FDA’s order rescinding the Collagen Scaffold’s substantial equivalence determination on the basis of inherent authority was therefore invalid. We reverse the judgment of the District Court. We direct the District Court to vacate FDA’s decision and to remand to the agency for further proceedings.

So ordered.

. As both a legal and a practical matter, the difference between our approach and the dissent’s approach is exceedingly narrow. As a legal matter, we simply read this particular statutory notice and comment scheme as one that, under our American Methyl precedent, negates FDA’s resort to its inherent authority in these circumstances. As a practical matter, FDA can still quickly and readily reclassify a device even with notice and comment. Moreover, in certain situations where it becomes necessary, an agency may rely on exceptions to the notice and comment requirement. See, e.g., 5 U.S.C. § 553(b)(3)(B).

. The District Court expressed concern about purported ex parte contacts between FDA officials and ReGen’s executives following the denial of ReGen's second premarket notification. See Ivy Sports Medicine, LLC v. Sebelius, 938 F.Supp.2d 47, 57 (D.D.C.2013). As Ivy points out, however, the statutes and FDA regulation barring companies from meeting with FDA officials apply only to formal, on-the-record hearings in a rulemaking or adjudication, not to informal agency proceedings, such as proceedings to determine substantial equivalence. See 5 U.S.C. § 557(a), (d); 21 C.F.R. § 10.55(a). And generally speaking, it is a good thing for agency officials to meet with regulated entities and other affected parties.