Opinion for the Court filed by Senior Circuit Judge WILLIAMS.
*671 Opinion concurring in part and concurring in the. judgment filed by Circuit Judge HENDERSON.
Opinion concurring in part and concurring in the judgment filed by Circuit Judge ROGERS.
WILLIAMS, Senior Circuit Judge:
The National Labor Relations Board determined that petitioners HTH Corporation and various affiliates (collectively “HTH” or the “company”) committed a host of severe and pervasive unfair labor practices, a finding that HTH does not here dispute. HTH does, however, petition for review of five extraordinary remedies imposed by the Board, three of them adopted by the Board sua sponte and two of them recommended by the administrative law judge but then modified by the Board. The company petitions for review of these new and modified remedies and the Board cross-applies for enforcement of its Order. Because the company failed to file a motion for reconsideration with the Board, we lack jurisdiction to consider the company’s objections to all but two of the challenged remedies. As to those two, we uphold one (notice-reading) and vacate the other (attorney’s fees).
The company, which operates the Pacific Beach Hotel in Honolulu, is no stranger to the Board or to the judicial system. Time and time again, the Board and the courts have concluded that the company violated the law in its dealings with the International Longshore and Warehouse Union, Local 142. A brief overview of the prior violations will provide context for the imposition of extraordinary remedies in this case.
Starting as early as 2002, the company unlawfully interfered with a representation election, HTH Corp., 342 N.L.R.B. 372, 374 (2004), and then with an election held to replace that election, Pacific Beach Corp., 344 N.L.R.B. 1160, 1163 (2005). The union prevailed in the latter and was duly certified. There followed various efforts to derail the union and two sets of unfair labor practice charges. The first set led to a Board order, HTH Corp., 356 N.L.R.B. 1397 (2011), enforced, 693 F.3d 1051 (9th Cir.2012), and to a court injunction under § 10(j) of the National Labor Relations Act, Norelli v. HTH Corp., 699 F.Supp.2d 1176 (D.Haw.2010), aff'd sub nom. Frankl v. HTH Corp., 650 F.3d 1334 (9th Cir.2011). The company violated that injunction, leading to compensatory contempt citations against it and its Regional Vice President, Robert Minicola. Frankl v. HTH Corp., 832 F.Supp.2d 1179 (D.Haw.2011).
The second set of charges ultimately resulted in the extraordinary remedies contested here. In September 2011 an administrative law judge determined that the company had violated the Act by disciplining and firing a union activist named Rhandy Villanueva (who had been unlawfully fired once before), unilaterally increasing housekeepers’ workloads, unreasonably withholding information from the union, surveilling union activities, banning two union representatives from the hotel and then announcing the ban to employees, threatening to remove a union agent who was distributing union literature from a public sidewalk, and halting its matching contributions to employees’ 401(k) plans. HTH Corp., 2011 WL 4073681 (Sept. 13, 2011). Several of these actions, including Villanueva’s second termination, were in violation of the § 10(j) injunction and formed the basis of the district court’s later imposition of contempt sanctions. See Frankl, 832 F.Supp.2d at 1187-1203, 1206-13, 1216-17. The ALJ recommended a set of remedies, only two of which are *672 relevant for our purposes: requirements of (1) notice-posting and (2) notice-reading.
The ALJ’s proposed notice-reading remedy required either the company’s CEO and its President, or Minicola (the Regional Vice President), to read to employees a “notice” drafted by the Board. In the “notice” the officials are to say that “we” have violated the National Labor Relations Act and the employees’ rights and to state 15 specific assurances in the form, “We will” adhere to specified NLRA obligations and remedy various breaches, or “We will not” violate the Act in a wide range of specified ways.
The company filed various exceptions to the ALJ’s decision. Only one is relevant here — an objection to the notice — reading remedy on the ground that extraordinary remedies were unwarranted because there had been no showing that traditional remedies were insufficient to cure the company’s unfair labor practices. The company didn’t object to the ALJ’s notice-posting remedy.
In October 2014 the Board issued the Order on appeal here. HTH Corp., 361 N.L.R.B. No. 65, 2014 WL 5426174 (Oct. 24, 2014). The Board agreed with the AL J that the company had committed each of the alleged violations but found the ALJ’s recommended remedies insufficient. Accordingly, it sua sponte ramped up the notice-posting and notice-reading requirements and imposed three additional extraordinary remedies.
We need not detail the Board’s expansions of the notice-posting requirement as (for reasons soon to be developed) the company’s objections to them are barred by § 10(e) of the Act. As to the notice-reading remedy, the Board decreased the burden in one respect and increased it in others. It mitigated the order by allowing the company to have a Board agent read the notice rather than requiring that Mini-cola or the CEO and President do so. It toughened the remedy by (1) removing the option of having the CEO and President read the notice (i.e., if a company manager is going to fulfill this obligation, it must be Minicola); (2) requiring that an Explanation of Rights be read at the notice-reading event; (3) requiring that all company supervisors and managers attend the reading; and (4) specifying that a union representative be allowed to be present.
The new Board remedies, not rooted in the ALJ’s report, consisted of (1) awarding litigation expenses to the General Counsel and the union; (2) awarding bargaining and other expenses to the union; and (3) subjecting the company for three years to Board “visitation” throughout company premises and files to assess compliance with the Board’s more conventional orders. The Board tripled the length of the “notice” to be read aloud by including, among other things, assurances that “We will” implement each of the Board’s remedial requirements. (The company points to a fourth new remedy — requiring publication of the notice and the Explanation of Rights in two local publications — but we think the publication requirement is classified more appropriately as an expansion of the notice-posting remedy. The classification has no effect on the preclusion of the company’s challenge, as it failed to object on this score to the ALJ’s order or to seek reconsideration of the Board’s.)
Two members of the Board, Members Miscimarra and Johnson, dissented.
The company didn’t file a motion for reconsideration with the Board, opting instead to go directly to this court. On appeal the company challenges only the three new remedies added by the Board and the expansions of the ALJ’s notice-posting and notice-reading remedies.
*673 We lack jurisdiction to consider most of the company’s objections because they were never raised before the Board. Section 10(e) of the Act provides that “[n]o objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.” 29 U.S.C. § 160(e). See also Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 665-66, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982) (the § 10(e) bar is jurisdictional). The company’s failure to file a motion for reconsideration bars all its challenges except, for reasons we’ll explain, its objections to the Board’s award of litigation expenses and aspects of its challenge to the notice-reading remedy.
The company raises several arguments in an attempt to salvage its barred claims. First, the company argues that the dissents by Members Miscimarra and Johnson offered the Board an opportunity to confront objections to its Order, and that the majority’s rejection of the dissenters’ points suggests that moving for reconsideration would have been futile. But a party may not rely on arguments raised in a dissent or on a discussion of the relevant issues by the majority to overcome the § 10(e) bar; the Act requires the party to raise its challenges itself. See Contractors’ Labor Pool, Inc. v. NLRB, 323 F.3d 1051, 1061 (D.C.Cir.2003); Local 900, Int’l Union of Elec., Radio and Mach. Workers v. NLRB, 727 F.2d 1184, 1191-92 (D.C.Cir.1984).
Next, the company argues that the challenged remedies are patently ultra vires and meet § 10(e)’s “extraordinary circumstances” exception. The company is right that we could review a remedy that is patently ultra vires. Alwin Mfg. Co. v. NLRB, 192 F.3d 133, 143 n. 13 (D.C.Cir.1999). But the Board’s remedial authority is broad, see, e.g., United Food & Commercial Workers Union Local 201 v. NLRB, 447 F.3d 821, 827 (D.C.Cir.2006), and that authority was. not patently exceeded under our precedents, particularly considering the company’s history of severe and pervasive unfair labor practices. Nor does the mere fact that the Board acted sua sponte constitute an “extraordinary circumstance”; the company was required to file a motion for reconsideration to preserve its challenges. See NLRB v. FLRA, 2 F.3d 1190, 1195 (D.C.Cir.1993).
Finally, the company argues that its exceptions to the ALJ’s decision sufficed to preserve its challenges even to remedies or requirements that the Board imposed sua sponte. But an exception, no matter how broadly formulated, cannot preserve an objection to something that the ALJ never imposed. See NLRB v. Sambo’s Rest., Inc., 641 F.2d 794, 796 (9th Cir.1981); NLRB v. St. Regis Paper Co., 674 F.2d 104, 108 n. 4 (1st Cir.1982). Cf. Quazite Div. of Morrison Molded Fiberglass Co. v. NLRB, 87 F.3d 493, 497 (D.C.Cir.1996) (“A categorical denial does not place the Board on notice that its particular choice of remedy is under attack[.]”).
The company did, however, argue before the Board that the notice-reading remedy was extraordinary and that extraordinary remedies were unwarranted because there had been no showing that traditional remedies were insufficient to address the unfair labor practices. Although the objection did not specify the attributes of the notice-reading remedy that called for special judicial concern (see below), we have held that “when the issues implicated by an imprecisely drafted objection are made evident by the context in which it is raised,” § 10(e) is not a bar. Consol. Freightways v. NLRB, 669 F.2d 790, 794 (D.C.Cir.1981). Indeed, the *674 Board does not dispute that the notice-reading remedy is properly before us.
Here, of course, the Board changed the remedy in various ways, most importantly by giving the company the option of having a Board agent read the notice. But the Board does not deny that even after its changes, the remedy remained “extraordinary” and thus subject to the objection that it’s unwarranted so long as traditional remedies suffice. See In Re Federated Logistics & Operations, 340 N.L.R.B. 255, 256 (2003) (acknowledging that notice-reading with the Board-agent option is an extraordinary remedy); First Legal Support Servs., LLC, 342 N.L.R.B. 350, 350 n. 6 (2004) (explaining that extraordinary remedies cannot be granted unless traditional remedies are insufficient). Although the option to have a Board employee read the notice alters matters, as we shall see when we address the merits, the order as modified poses objections similar in character to those posed by the ALJ recommendation. The Board’s additions, however, seem distinctive, and insofar as they may call for anything more than generalized analysis of the adequacy of traditional remedies, HTH should have sought reconsideration if it wished to challenge them in court.
In Judge Henderson’s view, “we- are without jurisdiction to consider the validity vel non of the Board-agent option.” Henderson Op. 682. Assuming that to be true, the company’s general challenge to the notice-reading remedy as an extraordinary remedy is not barred, and it would make little sense to consider that challenge without regard to the Board’s amelioration of the remedy (from HTH’s viewpoint) by giving HTH another option. Taken to its extreme, such hyper-refinement of party obligations under § 10(e) would mean that any change made by the Board sua sponte, however trivial, would require a motion for reconsideration (or else require the reviewing court to ignore the change). We decline to adopt this approach.
One other issue is also open to review — the Board’s award of litigation expenses. We have explained that filing a motion for reconsideration is patently futile where the agency had previously rejected the very argument made by petitioner. FLRA, 2 F.3d at 1196; cf. W & M Properties, Inc. v. NLRB, 514 F.3d 1341, 1346 (D.C.Cir.2008). The patent futility of a reconsideration motion excuses the failure to object, at least where the Board acts sua sponte. See FLRA, 2 F.3d at 1196. Here, the Board rejected the company’s argument with respect to litigation expenses — that the Board has no inherent authority to award such expenses — three years before its decision in this case. See Camelot Terrace, 357 N.L.R.B. 1934, 1937-39 (2011). The Board had also awarded litigation expenses based in part on its asserted inherent authority in earlier cases. See, e.g., Teamsters Local Union No. 122, 334 N.L.R.B. 1190, 1193 (2001); Alwin Mfg. Co., 326 N.L.R.B. 646, 647 & n. 6 (1998), enforced, 192 F.3d 133 (D.C.Cir.1999); Lake Holiday Manor, 325 N.L.R.B. 469, 469 & n. 5 (1998). In light of this precedent, asking the Board to reconsider its sua sponte decision to award litigation expenses in this case would have been patently futile — and the failure to do so is excused under § 10(e)’s “extraordinary circumstances” exception. See FLRA, 2 F.3d at 1196.
The cases generally do not distinguish between attorney’s fees and other litigation costs for purposes of applying the American rule. See, e.g., Nepera Chem., Inc. v. Sea-Land Serv., Inc., 794 F.2d 688, 696 n. 56 (D.C.Cir.1986) (“The reasons underlying the American Rule lead to the conclusion normally that litigation expenses other than attorneys’ fees are simi *675 larly nonrecoverable.”). See also Fox v. Vice, 563 U.S. 826, 131 S.Ct. 2205, 2213, 180 L.Ed.2d 45 (2011) (“Our legal system generally requires each party to bear his own litigation expenses, including attorney’s fees, regardless whether he wins or loses.” (emphasis added)); Int’l Union of Elec., Radio & Mach. Workers v. NLRB, 502 F.2d 349, 356 n. 22 (D.C.Cir.1974) (“The American rule generally disfavors the award of attorney fees and other litigation expenses except where specifically provided for by statute or contract.” (emphasis added)). Thus, as the parties have generally done in this case, we treat them as a package.
We turn now to the merits of the company’s two preserved challenges — the mandated notice-reading first. Recall that the ALJ recommended an order requiring specified high-level company officials to read out the notice acknowledging the company’s violations and committing not to indulge in such behavior in the future. The Board, apart from adding elements that § 10(e) bars us from considering, narrowed the choice of persons to one, Minico-la, but then broadened the company’s choices by giving it the option of having a Board employee read the notice in the presence of company management.
The history of our court’s consideration of this issue is long and complex, but displays two patterns: first, succeeding panels manifest no detectable obligation to heed prior panels; second, the degree of deference to the Board steadily increases. We will recite the three key cases in chronological order.
The line starts with International Union of Electrical, Radio & Machine Workers v. NLRB, 383 F.2d 230 (D.C.Cir.1967) (“IUE ”), in which the Board ordered “the employer” (it singled out no individual) to read a notice to “groups of employees, convened during working hours.” Id. at 232. This was on top of requirements that the employer mail the notice to each employee, post copies of the notice, and give a union access to the facilities to present the union position (on company time and at company expense). Id. & n. 4. After the usual genuflection to Board discretion, we dispatched the idea in two sentences:
The public reading by the employer of the order would, further, be humiliating and degrading to the employer and undoubtedly would have a lingering effect on future relations between the company and the Union. It could as well have an impact on the atmosphere, not only at the time of the reading, but in the future, for peaceful, fruitful, and effective labor bargaining.
Id. at 233 (footnote omitted). We then opened the door the tiniest sliver to a possible exception, and even in doing that we returned immediately to the basic proposition that such an order had no place in our democratic system:
It is conceivable that some conduct on the part of an employer or a union might reach such extreme dimensions as to justify the novel and drastic step of requiring the offending party to stand up before the employees and read the Board’s notice publicly, but we cannot close our eyes to the reality that such a course would inevitably poison the future relations between company and union and be a source of continuing resentment. The ignominy of a forced public reading and a “confession of sins” by any employer, any employee, or any union representative makes such a remedy incompatible with the democratic principles of the dignity of man.
Id. at 233-34. Although the opinion suggests that it is “conceivable” that some conduct would call for a mandatory reading remedy, the passage reverts to the *676 court’s basic take on the issue — that such a mandate is “incompatible with the democratic principles of the dignity of man.”
The next time we considered the matter, in Teamsters Local 115 v. NLRB, 640 F.2d 392 (D.C.Cir.1981), the court gave IUE a nodding glance, and then went on to give great weight to a “new” purpose advanced by the Board — the desirability of a management reading to provide employees “reassurances that this [unlawful] campaign will end.” Id. at 402 (citation and internal quotation marks omitted). What made this purpose so “new” the court did not reveal. The court then paraphrased IUE’s allusion to the conceivability of circumstances where, as the court put it, “the need for the remedy would outweigh its oppressiveness,” and without more ado approved mandatory employer reading. Id. at 403. Thus, what IUE had unequivocally condemned, subject to a “conceivable” exception, became something that with a little “balancing” would be quite all right.
The court did, however, gag on one aspect of the order — the specification of a named individual, the president and owner of the offending firm. As he had directly performed only one of the unfair labor practices, singling him out went too far. Id. at 403-04.
In the next case, Conair Corp. v. NLRB, 721 F.2d 1355 (D.C.Cir.1983), the court did not even pause to consider the propriety of a notice-reading mandate, and jumped directly to the specification of a named perpetrator. See id. at 1385-86. Thus what IUE had said was “incompatible with the democratic principles of the dignity of man” was now acceptable automatically. The court did make a footnote allusion to IUE, scoffing at the dissent’s reliance on it:
The dissent reaches back to our decision in [IUE] for language characterizing the requirement of a public reading as “incompatible with the democratic principles of the dignity of man.”
Id. at 1386 n. 99. (The “reach back” was a full 16 years, less than half the time that elapsed from Conair to the present.) It then went on to say that IUE had been “superseded, if not actually overruled, by our more recent decision” in Teamsters Local 115, id., without explaining what entitled one panel to overrule or “supersede” a prior panel’s decision. Normally such switches can be done only by the court en banc or by an Irons footnote (reflecting unanimous court approval). See LaShawn v. Barry, 87 F.3d 1389, 1395 (D.C.Cir.1996) (en banc).
The Conair court went on to approve what IUE had not even dreamed of and what Teamsters Local 115 had been unable to stomach: a mandate that a particular perpetrator read out the language specified by the Board. The court recognized that such public reading implicated dignity interests but held that the order was justified by the president’s “pervasive personal involvement” in his company’s unfair labor practices. Conair, 721 F.2d at 1386.
The dissent that the Conair majority dismissed in a footnote was by then-judge Ruth B. Ginsburg. Then-Judge Ginsburg objected to requiring Conair’s president to personally read out the notice, even though the president’s personal involvement in the company’s unfair labor practices was “far more conspicuous” than in Teamsters Local 115. Conair, 721 F.2d at 1401 (Ginsburg, J., dissenting). The dissent merits quoting at length:
I would modify the extraordinary notice remedies in one respect. The Board’s order requires that Conair’s president, Leandro Rizzuto, personally read the Board’s cease and desist notice to an assembly of employees; I would allow Rizzuto to choose between reading *677 the notice himself or designating a responsible officer to read it on his behalf.
[A] reading order “directed at a specified individual” is a “startling innovation.” [Teamsters Local 115, 640 F.2d at 403.] Such an order would occasion no surprise in a system in which those who offend against state regulation must confess and repent as a means of self-correction, or to educate others. But it is foreign to our system to force named individuals to speak prescribed words to attain rehabilitation or to enlighten an assembled audience. The Board, I believe, has not thoughtfully considered this point.
A forced, public “confession of sins,” even by an owner-president who has acted outrageously, is a humiliation this court once termed “incompatible with the democratic principles of the dignity of man.” [IUE ], 383 F.2d at 234. It has a punitive, vindictive quality, see Teamsters Local 115, 640 F.2d at 401, and is the kind of personal performance command equity decrees have avoided. Moreover, as Board Chairman Van de Water noted, Conair, 261 NLRB at 1195 n. 28, a reading of the notice by the president may be less effective than a reading by another responsible officer. The former, humiliated and degraded by the personal specific performance order, may demonstrate “by inflections and facial expressions, his disagreement with the terms of the notice.” Id. The latter, assigned the task but lacking the same personal involvement, may perform it with less distaste, more detachment, and thus with greater credibility. I would not single out the president here, or any other named individual, hand him lines, and make him sing.
Conair, 721 F.2d at 1401-02 (Ginsburg, J., dissenting) (some citations omitted).
It’s worth pausing to think briefly why so many of our distinguished predecessors have used the terms “humiliating and degrading,” “ignominy,” and “confession of sins” for a mandatory reading — especially by a named perpetrator — not to mention why then-judge Ginsburg acknowledged that an order of this sort “would occasion no surprise in a system in which those who offend against state regulation must confess and repent as a means of self-correction, or to educate others.” Id. at 1401. For those familiar with 20th century history, such an order conjures up the system of “criticism-self-criticism” devised by Stalin and adopted by Mao. “Criticism” generally took the form of an attack on the target by his or her peers at a meeting with fellow workers, spouting claims fed them by powerful members of the Communist party (on pain of themselves being tagged enemies of the people), and then regurgitated by the target (“self-criticism”) in the hopes that full confession might avert dispatch to the gulag, torture or execution.
What is the subtext communicated by the sort of scene the Board would mandate? What is communicated to the assembled workers and the perpetrator himself? “You see before you one of your managers, who normally has a responsibility to make important choices as to your work. But who is he? Not merely is he a lawbreaker, but he is a pathetic creature who can be forced to spout lines some government officials have put in his mouth. He is not even a parrot, who can choose when to speak; he is a puppet who speaks on command words that he may well abominate. We have successfully turned him into a pathetic semblance of a human being.” Of course, one may say, here it is just that the mighty have fallen; he was a lawbreaker. But fallen so low? Fallen to a condition that denies his autonomy? Cf. *678 United States v. Gementera, 379 F.3d 596, 611 (9th Cir.2004) (Hawkins, J., dissenting) (saying that the sole purpose of a sentence requiring a convicted mail thief to stand outside a post office for eight hours wearing a sandwich board stating, “I stole mail. This is my punishment” was “to turn him into a modern day Hester Prynne”).
As the quoted passage shows, then-Judge Ginsburg approved the idea of an order allowing the company to avoid the confessional feature by designating an officer to read out a notice acknowledging the company’s violations. The difference seems as obvious to us as it was to the court in Teamsters Local 115.
Here of course the Board gave the company another option — that of a having a Board agent read the notice to the employees in the presence of management. This measure, too, has a history in our court. In IUE we condemned it harshly in dictum: “This procedure ... creates a problem more severe than the one it supposedly solves” because its “practical effect” “is to put the imprimatur of the Board on both a particular union’s activities, as well as on union activities in general.” 383 F.2d at 233 n. 5. See also Teamsters Local 115, 640 F.2d at 402 n. 11 (“We ... continue to doubt the propriety of having a Board representative perform the reading.” (citing IUE)). Recently, however, we enforced a notice-reading order with the Board-agent option, without even a nod to IUE (which neither party had cited). Federated Logistics & Operations v. NLRB, 400 F.3d 920, 929-30 (D.C.Cir.2005). Although the court gave no explanation for the switch, we believe that the “imprimatur” concern appears weak. After all, the substance of the notice will make employees fully aware of how the Board has ruled, of which “side” the Board has taken.
Indeed, in NLRB v. S.E. Nichols, Inc., 862 F.2d 952 (2d Cir.1988), when the Second Circuit found itself confronted with an order that the president of an offending retail chain read a notice, the court (sua sponte so far as appears) limited the order to the store where the violations had taken place and required the Board to give the company the alternative, at its option, of having the notice read by a Board representative. Id. at 962. “This alternative eliminates the necessity of participation by the company, if it so desires, and still guarantees effective communication of the Board’s order to the company’s employees.” Id. See also Textile Workers Union v. NLRB, 388 F.2d 896, 904 (2d Cir.1967) (rejecting the imprimatur idea). Accordingly, we feel no obligation to follow the court’s previous dicta.
Given the company’s long history of unlawful practices and the severe violations the Board found in this case, we uphold the Board’s exercise of discretion in ordering notice-reading in the modified form, i.e., with the company having the option of punting the task to a Board employee. (As explained above, we lack jurisdiction to consider the company’s challenges to the additional requirements the Board appended to the notice-reading remedy. We therefore enforce those requirements.) Further, given the option of having the notice read by a Board employee, we have no need to address the validity of an employee-specific notice-reading mandate unaccompanied by such an option.
We turn next to the Board’s award of litigation expenses to the General Counsel and the union. In Unbelievable, Inc. v. NLRB, 118 F.3d 795, 800-06 (D.C.Cir.1997), we held that the Board lacks authority to shift litigation expenses under § 10(c) of the Act, which empowers the Board “to take such affirmative action in- *679 eluding reinstatement of employees with or without back pay, as will effectuate the policies of [the Act],” 29 U.S.C. § 160(c). In ordering fees in this case, the Board recognized the holding in Unbelievable but claimed that, like a federal court, it has “inherent authority to control and maintain the integrity of its own proceedings through an application of the bad-faith exception to the American Rule.” HTH Corp., 361 N.L.R.B. No. 65, Amended Deferred Appendix (“App.”) 3-4. See Chambers v. NASCO, Inc., 501 U.S. 32, 45-46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (recognizing that although the American rule prohibits fee shifting in most cases, federal courts have inherent power to assess attorney’s fees “when a party has ‘acted in bad faith, vexatiously, wantonly, or for oppressive reasons’ ” (citation and internal quotation marks omitted)).
As a creature of statute the Board has only those powers conferred upon it by Congress. See Louisiana Pub. Serv. Comm’n v. FCC, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986); Michigan v. EPA, 268 F.3d 1075, 1081 (D.C.Cir.2001). To be sure, we have recognized that agencies enjoy some powers that were not expressly enumerated by Congress. See, e.g., Ivy Sports Med., LLC v. Burwell, 767 F.3d 81, 86 (D.C.Cir.2014) (power to reconsider prior decisions); Polydoroff v. ICC, 773 F.2d 372, 374 (D.C.Cir.1985) (power to police the behavior of practitioners); Howard Sober, Inc. v. ICC, 628 F.2d 36, 41 (D.C.Cir.1980) (power to correct clerical mistakes). Although we have often described these powers as “inherent,” the more accurate label is “statutorily implicit.” See Ivy Sports, 767 F.3d at 93 (Pillard, J., dissenting). Therefore, unlike a federal court, the Board may apply the bad-faith exception to the American rule only if some provision or provisions of the Act explicitly or implicitly grant it power to do so.
In deciding to award litigation expenses on a bad-faith theory, the Board relied solely on its “inherent authority to control and maintain the integrity of its own proceedings.” HTH Corp., 361 N.L.R.B. No. 65, App. 3-4. Neither in its Order nor on appeal has the Board argued that the power to shift fees in cases of bad faith is implicit in the Act. Given that it is wrong to speak of agencies as having any inherent authority, it would under many circumstances be quite appropriate for us to say that the Board has cited no pertinent authority at all, to vacate this part of the Order under review, and to have done with it.
There are several reasons to reject that approach and consider whether § 10(c) implicitly authorizes fee shifting based on bad faith. First, the distinction'between inherent authority and implicitly granted authority is a subtle one — so subtle that this court generally overlooked it until Judge Pillard pointed it out in Ivy Sports. Second, considering § 10(c) does not take us into refined linguistic nuances; § 10(c) simply authorizes the Board to take “such affirmative action ... as will effectuate the policies” of the Act. Third, and closely related to the purely linguistic point, the decisive considerations resolving the issue stem not from the exact language of § 10(c) but from contextual concerns that were at the heart of Unbelievable and the subject of intense discussion at oral argument.
The controlling contextual concern arises from two propositions: first, that nothing in § 10(c) grants the Board punitive powers, and, second, that application of the American rule’s bad-faith exception is punitive. On the first, as we said in Unbelievable, “The Supreme Court has consistently invalidated Board orders that *680 are not directly related to the effectuation of the purposes of the Act or are punitive.” 118 F.3d at 805 (emphasis added). We cited several decisions in support of that proposition, starting with Consolidated Edison Co. v. NLRB, 305 U.S. 197, 235-36, 59 S.Ct. 206, 83 L.Ed. 126 (1938), which held that the Board’s purported cancellation of bargaining agreements that were not causally derived from the alleged unfair labor practices was punitive and therefore not within the Board’s § 10(c) powers, even if the Board should “be of the opinion that the policies of the Act might be effectuated by such an order.” Id. at 236, 59 S.Ct. 206. Similarly, once we found in Capital Cleaning Contractors, Inc. v. NLRB, 147 F.3d 999, 1009-12 (D.C.Cir.1998), that the Board’s imposition of contract terms on a successor employer based on terms negotiated by its predecessor was punitive in the circumstances, we held it beyond the Board’s powers. A § 10(c) remedy, we said, “must be truly remedial and not punitive.” Id. at 1009.
This authoritative ban on punitive remedies by the Board is triggered here: the Supreme Court has consistently classified application of the bad-faith exception to the American rule as punitive. Hall v. Cole, 412 U.S. 1, 5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). Such fee shifting is akin to a fine for civil contempt: both serve the purpose of vindicating the tribunal’s authority over a recalcitrant litigant. Chambers, 501 U.S. at 53, 111 S.Ct. 2123.
The Board doesn’t dispute that it may not adopt punitive remedies but argues instead that its award of litigation expenses is “clearly compensatory in nature.” HTH Corp., 361 N.L.R.B. No. 65, App. 4. According to the Board, the General Counsel and the union were forced to squander resources on this case, and the fee award merely “helps restore the parties to where they would have been but for the [company’s] unlawful conduct.” Id. Of course we recognize that compensation and punishment are not inherently mutually exclusive goals. But in the context of the American rule, any attempt to rest on the compensatory character of a fee award runs into the basic underpinning of the American rule, namely, the idea that the compensatory functions of fee shifting collide, in the litigation context, with other values, particularly broad freedom to assert rights and defenses. See Summit Valley Indus. Inc. v. Local 112, 456 U.S. 717, 724-25, 102 S.Ct. 2112, 72 L.Ed.2d 511 (1982). Thus we said in Unbelievable, “To the extent that the Board is relying upon the idea that a party is not made whole unless it recovers its attorney’s fees, ... that is but a criticism of the American Rule — indeed, a criticism that the Supreme Court has heard and rejected.” 118 F.3d at 805. As the Supreme Court declared in Chambers, “That the award ha[s] a compensatory effect does not in any event distinguish it from a fine for civil contempt, which also compensates a private party for the consequences of a con-temnor’s disobedience.” 501 U.S. at 53-54, 111 S.Ct. 2123 (citation and internal quotation marks omitted). See also id. at 54 n. 15, 111 S.Ct. 2123.
The Board’s opinion also says that the fee award “protects the integrity of our processes, serving as a deterrent to violations” of its Order and protecting the parties’ rights (presumably by way of deterring further unfair labor practices). HTH Corp., 361 N.L.R.B. No. 65, App. 4. But in the context of identifying the powers granted the Board, the Court has rejected deterrent purposes precisely on the ground of their overlap with punitive goals. When the Board tried to order an employer to compensate government relief agencies whose expenditures had been increased as a result of the employer’s violations, the Court firmly rejected the *681 Board’s reliance on deterrent effect. If “a deterrent effect is sufficient to sustain an order of the Board, it would be free to set up any system of penalties which it would deem adequate to that end.” Republic Steel Corp. v. NLRB, 311 U.S. 7, 12, 61 S.Ct. 77, 85 L.Ed. 6 (1940).
Because the Board has (at best) invoked only § 10(c), we do not decide whether the power to shift fees in cases of bad faith may be implicit in some other provision of the Act.
With respect to the award of litigation expenses, we grant the company’s petition and deny enforcement. As to all other portions of the Order, we deny the petition and enforce the Order, either on the merits or because of HTH’s failure to meet the requirements of § 10(e).

So ordered.