# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 10, 2017         Decided May 26, 2017

No. 15-1039

HAWAIIAN DREDGING CONSTRUCTION COMPANY, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL BROTHERHOOD OF BOILERMAKERS LOCAL
627,
INTERVENOR

Consolidated with 15-1424

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

*Barry W. Marr* argued the cause for petitioner. With him on the briefs was *Megumi Sakae*.

*David Casserly*, Attorney, National Labor Relations Board, argued the cause for respondent. On the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General

Counsel, *Usha Dheenan*, Supervisory Attorney, and *Marci J. Finkelstein*, Attorney.

*David A. Rosenfeld* argued the cause and filed the brief for intervenor International Brotherhood of Boilermakers Local 627 in support of respondent. *Caren P. Sencer* entered an appearance.

Before: ROGERS and MILLETT, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Section 8(f) of the National Labor Relations Act, 29 U.S.C. § 158(f), allows employers in the construction industry to enter into pre-hire agreements with unions without a showing that a majority of their employees support the union. *M&M Backhoe Serv., Inc. v. NLRB*, 469 F.3d 1047, 1048 (D.C. Cir. 2006); *Nova Plumbing, Inc. v. NLRB*, 330 F.3d 531, 534 (D.C. Cir. 2003). Absent the usual statutory obligation of the parties to maintain the *status quo* upon expiration of their collective bargaining agreement, until impasse or a new agreement is reached, the Board had to determine whether the Hawaiian Dredging Construction Company's discharge of its welders, after their Section 8(f) agreement had expired, was motivated by an intent to discriminate in violation of the employees' statutory rights, or reflected the company's long-standing business practice to rely on union hiring halls under Section 8(f) agreements for craft employees. The Board ruled the company violated Sections 8(a)(3) and (1) of the Act by terminating the welders because of their union membership. The company petitions for review, contending that the Board's analysis under its own precedent is flawed and unsupported by substantial evidence. Because the Board failed to adequately address record evidence regarding the

company's understanding of its twenty-year practice and appears to have strayed from its precedent, we grant the petition for review, deny the Board's cross-application for enforcement of its Order, and remand the case to the Board.

**I.**

In 1959, Congress amended the National Labor Relations Act, to address specific needs of the construction industry. The Act had been "developed without reference to the construction industry," *NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers, AFL-CIO*, 434 U.S. 335, 348 (1978) (quoting H.R. Rep. No. 741, 86th Cong., 1st Sess., at 19 (1959)), and yet "[r]epresentation elections in a large segment of the industry [were] not feasible to demonstrate . . . majority status due to the short periods of actual employment by specific employers." *Id.* at 349 (quoting S. Rep. No. 187, 86th Cong., 1st Sess., at 55 (1959)). In order to allow an employer primarily engaged in construction work to "know his labor costs before making the estimate upon which his bid [for a project] will be based," and to ensure employers in the construction industry "have available a supply of skilled craftsmen ready for quick referral," *id.* at 348 (quoting H.R. Rep. 741 at 19), Congress provided, subject to exceptions not at issue here:

> It shall not be an unfair labor practice . . . for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged . . . in the building and construction industry with a labor organization of which building and construction employees are members . . . because (1) the majority status of such labor organization has not been established . . . or (2) such agreement requires as a condition of employment, membership in such labor organization . . . or (3) such

agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment[.]

29 U.S.C. § 158(f). By contrast, under typical collective bargaining agreements, the parties have an obligation, upon expiration of their agreement, to bargain in good faith and to maintain the *status quo* as to all mandatory subjects of bargaining until they reach a new agreement or an impasse. *See Oak Harbor Freight Lines, Inc. v. NLRB*, No. 14-1226, 2017 WL 1556126, at *1 (D.C. Cir. May 2, 2017) (citing, *inter alia*, *NLRB v. Katz*, 369 U.S. 736, 743 (1962)); *see also M&M Backhoe Serv.*, 469 F.3d at 1048.

Hawaiian Dredging is the largest general contractor in the State of Hawaii, employing around 375 craft labor employees to work on renovation, foundation, power, and industrial projects. As a member of the Association of Boilermakers Employers of Hawaii, the company has performed its craft work pursuant to Section 8(f) pre-hire collective bargaining agreements. As of 2010, such agreements had existed for at least twenty years with the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers, Local 627 ("Boilermakers"). The parties' latest agreement expired on September 30, 2010.

On October 1, the Boilermakers notified the company of availability to continue negotiation, attaching a letter from counsel that because the parties' Section 8(f) agreement had expired its members were free to cease working without notice. Some members of the Boilermakers refused to work that day, but resumed work on Monday, October 4. On October 8, the

parties reached an interim agreement to extend the terms of the expired agreement through October 29 and to make the new collective bargaining agreement retroactive to September 30, 2010. Negotiations for a new collective bargaining agreement continued after October 29, however, with the parties disagreeing over inclusion of certain benefits. On November 1, 2010, the Boilermakers sent the company the terms of a new collective bargaining agreement. Tom Valentine, the company's senior manager, responded that the parties had not agreed to two provisions included by the Boilermakers. Further negotiations ensued.

On November 12, Valentine sent the Boilermakers what he understood was their final agreement but the Boilermakers refused to sign it, requesting changes that the company thought had already been negotiated. The company filed an unfair labor charge with the National Labor Relations Board based on the Boilermakers' refusal to sign the November 12 collective bargaining agreement as a failure to bargain in good faith by attempting to add employee benefits without negotiation. The same day, December 6, 2010, the Boilermakers refused to honor a dispatch request for members to work on the company projects. Valentine emailed the Boilermakers business representative: "I do not understand the reason for this failure to honor the dispatch. We have a disputed contract and our position has always been that upon resolution the contract would be retroactive to October 1, 2010." Email from Tom Valentine to Gary Aycock (Dec. 6, 2010). As of six days later, Valentine reported to company management, the Boilermakers had timely responded to only one of the company's thirteen requests for workers, and that the delays were "impacting our ability to respond to customer needs and plan upcoming work." By December 16, the company determined that the Boilermakers had failed to dispatch workers for 24 twelve-hour shifts.

On February 14, 2011, the Board's Regional Director in Honolulu dismissed the company's charge against the Boilermakers, finding that there was no complete agreement on the terms of the successor collective bargaining agreement, and therefore the Boilermakers' refusal to sign the November 12 agreement was not an unfair labor practice. The company did not appeal. Instead, by letter of February 17, 2011, the company terminated its relationship with the Boilermakers, stating that "based upon [the] Regional Director's finding" that no current agreement exists, and since their prior agreement had terminated September 30, 2010, the company "does not intend to utilize members of the Boilermaker's Union for future work." The letter, signed by Valentine, as Chairman of the Association of Boilermaker Employers of Hawaii, also stated the company had previously hoped to reach a new agreement but that the Boilermakers did "not appear to be genuinely interested in continuing a partnership between its members and Hawaii contractors." The same day the company temporarily ceased performing all welding work.

Within a week, the company entered into a Section 8(f) agreement with the United Association of Journeymen and Apprentice Plumbers & Pipefitters of the U.S. & Canada, Local 675 ("Pipefitters"). Under the collective bargaining agreement, Boilermakers members could continue to work for the company only if they became members of the Pipefitters. The company offered assistance to the discharged employees in the form of tools, equipment, and coaching to assist their efforts to pass the Pipefitters test; eight of the thirteen discharged employees ultimately resumed work for the company as members of the Pipefitters.

On May 12, 2011, the Boilermakers filed a charge with the Board, alleging that the company had violated Sections 8(a)(3) and (1) of the Act by terminating the thirteen welders because

they were members of the Boilermakers, and sought reimbursement for the wages they would have earned absent the company's unlawful discrimination. An Administrative Law Judge ("ALJ"), after an evidentiary hearing, found no statutory violation in "the unique factual circumstances present in this case." ALJ Dec. 25 (Feb. 4, 2013). The Board reversed, with one member dissenting. A majority of the Board found the discharges were unlawful under both *Wright Line*, 251 NLRB 1083 (1980), and *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26 (1967). Critical to its analysis was rejection of the ALJ's finding that company officials believed the company only hired craft workers under collective bargaining agreements. As the Board stated: "Upon examination of the full record, . . . we are not persuaded that the [company] so strictly adheres to that practice [of having current craft contracts] that it would have discharged the discriminatees on that basis alone." Dec. 3 (Feb. 9, 2015). It identified two periods when the company "knowingly operated without an agreement in place:" (1) from October 1, 2010, when the parties' agreement expired, until October 8, 2010, when they agreed to extend the expired contract's terms to October 29 and the company "continued to perform craft work during that week-long period;" and (2) from October 30, 2010, to November 12, 2010, when the company thought the parties had negotiated a successor agreement. *Id.* at 3–4. As for *Great Dane*, the Board concluded that the company had failed to show that it was necessary to discharge rather than lay off the discriminatees when it temporarily ceased welding operations. *Id*. at 7 n.14.

Member Miscimarra dissented. He viewed the two "gaps" to be less compelling than his colleagues. Not only were there continuing agreements between the parties "by tacit agreement," Dis. Op. 15, he concluded that "[e]ven assuming there was a brief gap of less than a week in [the company's] *decades-long* practice of performing all craft work under collective bargaining

agreements," this did not defeat its defense because, as the ALJ found, the discharges were permissible under *Great Dane* and *Wright Line*. *Id.* at 15 n.33. The Board responded that the dissent had overlooked the parties' disagreement about the existence of an agreement during the first gap and the absence of corroboration for a tacit agreement during the second gap. *See* Dec. 3–4.

## II.

The company petitions for review of the Board's decision and order, contending that the Board's decision that it violated Sections 8(a)(3) and (1) of the Act is not supported by substantial evidence of an unlawfully motivated discharge under *Wright Line* or "inherently destructive" conduct under *Great Dane*.

The court's "role in reviewing an NLRB decision is limited," *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011), and "a decision of the NLRB will be overturned only if the Board's factual findings are not supported by substantial evidence, or the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case," *Pirlott v. NLRB*, 522 F.3d 423, 432 (D.C. Cir. 2008) (internal quotations omitted). *See also Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 217 (1938); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). An agency decision is arbitrary when it "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Board's decision, therefore, must "enable [the court] to conclude that [its action] was the product of reasoned decisionmaking," *id.* at 52, in part because the Board "engage[d] the arguments raised before it," *Del. Dep't*

*of Natural Res. & Envtl. Control v. EPA*, 785 F.3d 1, 11 (D.C. Cir. 2015) (internal quotations omitted), including those of a dissenting member, *see Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 144–45 (D.C. Cir. 2005); *Contractors' Labor Pool, Inc. v. NLRB*, 323 F.3d 1051, 1061 n.6 (D.C. Cir. 2003).

Because of the distinct features of Section 8(f) pre-hire agreements, employer-union disputes in the construction industry do not necessarily track similar disputes in other industries. Here, the Board was confronted with deciding whether the company's discharge of members of the Boilermakers constituted unlawful discrimination or reflected adherence to its business model of requiring all craft work to be performed under Section 8(f) agreements. Recognizing that the answer turned on the company's motive, the Board applied its two-stage analysis under *Wright Line*. The General Counsel "bears the initial burden" to make a *prima facie* showing sufficient to support the inference that protected conduct was a motivating factor in the employer's decision to take the adverse employment action; the employer may then rebut the inference by showing that it would have taken the same action absent the protected conduct. *Laro Maint. Corp. v. NLRB*, 56 F.3d 224, 228 (D.C. Cir. 1994). *See also Earthgrains Co.*, 338 NLRB 845, 849 (2003); *Wright Line*, 251 NLRB at 1089. The Board concluded that the existence of protected activity and the employer's knowledge of that activity were undisputed, and a majority of the Board concluded that animus and nexus were "readily established" by the company's "summary discharge of all of its Boilermakers-represented employees, and *only* its Boilermakers-represented employees." Dec. 3. While acknowledging the company's position that its business model for all craft work was the reason for the discharges, and not the welders' union affiliation, the majority concluded, in view of the periods when the company continued to perform craft work without a Section 8(f) agreement, that the company failed to

rebut the inference of discriminatory intent. *Id.* at 4.

The company challenges the Board's application of the first two elements of its *Wright Line* standard, *see Earthgrains*, 338 NLRB at 849, on the ground that the Boilermakers were not engaged in protected activity. In the company's view, the Board erred in making an "assumption . . . based on its unsupported belief that the welders' union affiliation was itself protected union activity," when such a rule does not exist and would render the first two elements of the *Wright Line* test "illusory elements that the General Counsel essentially never has to prove." Pet'r/Cross-Resp't Br. 29–30. There is little precedent on whether union membership alone is protected activity under *Wright Line*. The company relies on *Midwest Television, Inc.*, 343 NLRB 748 (2004). But in that case the discharge of the union member was not based on his involvement in protected activity, *id.* at 751, whereas here the welders' Boilermakers membership was referenced in Valentine's February 17 letter regarding their discharge.

The court need not resolve whether union membership *per se* is protected activity under *Wright Line* because, in light of the company's challenge to the remaining elements of the *Wright Line* standard — animus and nexus, *see Earthgrains*, 338 NLRB at 849 — the Board's consideration of the evidence in finding Section 8(a)(3) and (1) violations is, at this point, problematic. Section 8(a)(3) provides, in relevant part:

> It shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[.]

29 U.S.C. § 158(a)(3). Subsection (1) provides it shall be an unfair labor practice for an employer to interfere with employees' Section 7 rights, including to join or assist a union. *Id.* at § 158(a)(1). In *American Ship Building Company v. NLRB*, 380 U.S. 300 (1965), the Supreme Court emphasized that it has "consistently construed [Section 8(a)(3)] to leave unscathed a wide range of employer actions . . . even though the act committed may tend to discourage union membership." *Id.* at 311. The Court explained "[s]uch a construction of § 8(a)(3) is essential if due protection is to be accorded the employer's right to manage his enterprise." *Id.* Although both discrimination and a resulting discouragement of union membership must be shown under Section 8(a)(3), the Court observed that "[i]t has long been established that a finding of violation . . . will normally turn on the employer's motivation." *Id.*

So too here, in the Section 8(f) context, as the Board acknowledged in viewing *Wright Line* to provide the relevant analysis. Although conduct by the employer can "carr[y] with it an inference of unlawful intention so compelling that it is justifiable to disbelieve the employer's protestations of innocent purpose," *id.* at 311–12, the Board's conclusion fails adequately to address the evidence before it and the unique legal framework of a Section 8(f) pre-hire agreement. The ALJ's decision appears to present a classic analysis of how Section 8(f) agreements work in the construction industry. Emphasizing the unique context in which the Boilermakers' charge arose, the ALJ distinguished the usual circumstances in which *Great Dane* and its progeny had been applied, namely, in "strikes, lockouts, and other actions where the parties have some sort of continuing obligation to each other." ALJ Dec. 23. "This case occurs in a very different context that derives from the unique nature of the construction industry." *Id.* The ALJ observed that "consistent with its longstanding practice, the [company] refused to go

'open shop' and would only employ craft workers who were affiliated with a union and were operating under a [collective bargaining agreement], regardless of any particular union affiliation." *Id*. "Against this unusual factual backdrop," the ALJ found the company's conduct was not "inherently destructive" of important employee rights because there was no future bargaining going on at the time of the discharges, which therefore did not hinder future bargaining. *Id.* The ALJ also found the company did not distinguish between employees based on their protected activity, but instead laid off the welders "because they were no longer working under a contract, not because they were members of the Boilermakers." *Id*. The ALJ recognized, however, that "the transition was not seamless." Nonetheless, the company had acted quickly "and its managers clearly prioritized the continued employment of the alleged discriminatees without regard to whether they were still members of the Boilermakers." *Id*. at 24. The ALJ further recognized that being a member of the Boilermakers and the lack of a contract went "hand in hand." *Id.* Under the circumstances, however, the company's action was not Section 8(a)(3) discrimination. *Id*. That "employees suffered economic disadvantage because of their union's insistence on demands unacceptable to the [company]" was par for the course in bargaining disputes and not Section 8(a)(3) discrimination "absent some unlawful intention." *Id.*

Further, the ALJ found, even assuming the company's conduct was inherently destructive of employees' statutory rights, that the adverse effect on those rights was "comparatively slight" because no welding work was done between February 17 and March 1, 2011, when the first employee was sent under the Pipefitters' Section 8(f) agreement; once that agreement was in place, the company had "facilitated returning the employees to work . . . on a nondiscriminatory basis." *Id.* at 23. *See also id*. at 24. Crediting testimony from the company's president and

Valentine, the ALJ concluded that "[n]either the Acting General Counsel nor the Union has refuted the [company's] evidence that, for at least the past 20 years, it has exclusively relied on the union hiring halls to provide labor to it under [collective bargaining agreements] governed by Section 8(f)." *Id*. at 24. And rejecting the General Counsel's other arguments, the ALJ observed that "there is no hint that the [company] was discouraging union activity or any rights protected under the Act." *Id*. at 25. Additionally, the ALJ concluded that the Boilermakers' case would fail under *Wright Line* (which was not argued by the parties), because even assuming protected conduct was a motivating factor, the company's "requirement to have its craft work performed pursuant to [Section 8(f) collective bargaining agreements] is a legitimate nondiscriminatory reason for its actions, and the Acting General Counsel has not presented evidence to show this was pretext." *Id*. at 24 n.9.

The Board does not appear to have rejected the ALJ's view that the construction industry presents unique circumstances for purposes of determining Section 8(a)(3) and (1) violations. Yet the Board never confronted the evidence relied on by the ALJ as to nexus and animus, namely that the company's Section 8(f) agreements contemplated implied agreements during gap periods and overwhelmingly showed that the company's conduct was inconsistent with discouraging union membership, much less Boilermakers membership. Given the evidence on the nature of the company's twenty-year practice under its business model, as found by the ALJ and discussed by the dissenting member, and the evidence credited by the ALJ relevant to the company's motive, the Board failed adequately to explain its conclusion that the gap periods defeated the company's defense and the company would not discharge craft employees where no current Section 8(f) agreement existed and the company had no expectation of a new agreement with the Boilermakers.

14

The Board did not ignore entirely the company's arguments or the dissenting member's views. *See, e.g.*, Dec. 4, 6. But it never confronted the critical point that, in view of the evidence regarding the company's twenty-year practice, and the company's credited evidence, the Board was giving inappropriate emphasis to the gap periods. For instance, Member Miscimarra, echoing the company's arguments, concluded as to animus and nexus that the Board had "fail[ed] to appreciate the nature of the [company's] collective-bargaining relationships, which historically had been 'very cooperative,'" and the fact that "[t]he evidence shows that in practice, the [company] and the unions with which it partners have treated hiatus periods between 8(f) contracts as contract extensions." Dis. Op. 14. He explained,

> even assuming there was a brief gap of less than a week in [the company's] *decades-long* practice of performing all craft work under collective bargaining agreements . . . this cannot reasonably be regarded as defeating [the company's] *Wright Line* defense. Under the majority's view, the only way the [company] could establish a valid *Wright Line* defense would have been to immediately cease all welding work the very moment the 2005–2010 [Section 8(f) collective bargaining agreement] expired, but this would have been contrary to [the company's] long history of bridging such hiatus periods cooperatively.

*Id.* at 15 n.33. The Board has no response to this contradiction in its analysis. Its response was limited to the gap periods. Dec. 3–4.

Under *Wright Line*, evidence of a good faith belief suffices to establish a defense, even if the belief is erroneous. *See, e.g., Sutter East Bay Hosps. v. NLRB*, 687 F.3d 424, 435–36 (D.C.

Cir. 2012). The Board's current analysis under *Wright Line* offers no adequate reason to conclude that even if company officials were mistaken factually about their history, their belief was insufficient to rebut the inference of discriminatory motive. *See id.* The ALJ credited the company's testimony that they had — or at least they believed that they had — performed all craft work in the last twenty years under Section 8(f) agreements. The ALJ concluded therefore that the company had presented in rebuttal legitimate and substantial business justifications for its action, distinguishing Board precedent on which the General Counsel and the Boilermakers relied. *See* ALJ Dec. 24–25. The Board, of course, was not required to reach the same conclusion as the ALJ, but so far it has not adequately engaged the record evidence, and by not doing so it had failed to "exercise[] its judgment in a reasoned way." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 652 (D.C. Cir. 2016).

The Board's alternative analysis under *Great Dane* also provides no basis for denying the company's petition. The Board found that the company's conduct "was inherently destructive of [Boilermakers members'] right to membership in the union of their choosing, unencumbered by the threat of adverse employment action." Dec. 5. The company's February 17 letter terminating its relationship with the Boilermakers does include a sentence referencing Boilermakers membership but that supports the Board's view only if it is extracted from what else was stated in the letter and record evidence, including the company's twenty-year practice with Section 8(f) agreements. The Board did state "[e]ven assuming . . . that the [company] discharged the alleged discriminatees because there was no collective-bargaining agreement in place," that it "would still find that this justification did not outweigh the harm done to the employees on account of their union affiliation." *Id.* at 6. But no exception was filed to the ALJ's finding that the discharges had only a comparatively slight adverse impact. *Id.* at 7 n.14.

Neither did the Board find that the company's business model was designed to, nor in fact operated to, single out particular unions for discriminatory treatment without regard to the absence of a current collective bargaining agreement. Other than referencing the two gaps and the parties' disagreement during their negotiations, the Board appears to have offered no reason for rejecting evidence that the company's conduct was only plausibly "inherently destructive" if the welders were separated *because* of their union membership, rather than — as the ALJ found — because of the expiration of their contract.

Accordingly, because the Board's analysis failed to engage with evidence credited by the ALJ in the context of Section 8(f) for purposes of determining whether the company violated Sections 8(a)(3) and (1), we grant the petition for review, deny the Board's cross-application for enforcement of its order, and remand the case to the Board for further consideration.