# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 12, 2020          Decided July 24, 2020

No. 18-1219

ADVANCEPIERRE FOODS, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL
75,
INTERVENOR

———

Consolidated with 18-1246

———

On Petition for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

———

*Aaron D. Lindstrom* argued the cause for petitioner. With
him on the briefs was *Amy J. Zdravecky.*

*Michael R. Hickson*, Attorney, National Labor Relations
Board, argued the cause for respondent. With him on the brief
were *Elizabeth A. Heaney*, Supervisory Attorney, *Peter B.
Robb*, General Counsel, *Meredith Jason*, Acting Deputy

Associate General Counsel, and *David Habenstreit*, Assistant General Counsel.

Before: HENDERSON, WILKINS and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: When employees of AdvancePierre Foods, Inc.'s (AdvancePierre or Company) Cincinnati, Ohio, food processing plant first sought to organize, the Company botched its response. The National Labor Relations Board (NLRB or Board) found that AdvancePierre committed seventeen unfair labor practices (ULPs) over a five-month span as the United Food and Commercial Workers Union, Local 75 (Union) conducted an organizing campaign. Among its remedies, the Board ordered that a Company employee read aloud to employees a notice of the Company's violations. Only one ULP—whether AdvancePierre unlawfully encouraged its employees to withdraw their union authorization cards—and the "read-aloud" remedy are before us. We deny AdvancePierre's petition on both fronts.

## A. Background

Because the Board's remedy implicates the panoply of AdvancePierre's misdeeds, we begin with a factual recap. In March 2015, employees in AdvancePierre's Cincinnati plant— in which it manufactures processed foods for restaurant chains and retail businesses and for sale in convenience stores— contacted the Union to discuss organizing approximately six hundred hourly employees. AdvancePierre was aware of the unionization effort by May 11, at which point Union literature and authorization cards were being widely distributed. The

Company's opposition began with a critical mistake when, on May 13, Employee Relations Manager Mandy Ramirez (Ramirez) posted an outdated company policy on the plant's bulletin board. Instead of posting the then-current policy of January 1, 2012, Ramirez posted a 2001 policy. The 2001 policy—which AdvancePierre concedes was "unlawfully overbroad"—prohibited any on-the-job union solicitation or distribution of union literature. Pet'r's Br. 9. Consistent with the outdated 2001 policy, a sign was posted above the plant's main employee entrance stating: "AdvancePierre Foods has a non-solicitation and non-distribution policy." J.A. 626. The policy and sign were both mistakenly in effect for nearly a month before management informed employees of its mistake.[1]

Not only did AdvancePierre post an outdated, overbroad policy—the Company enforced it. On June 8, AdvancePierre conducted a search of boxes affixed to employee clipboards, confiscated union authorization cards attached to employee Ronnie Fox's clipboard and issued Fox a verbal warning for violating the 2001 policy. The following day, acting on a tip that Union literature was being distributed in the plant's breakroom, Ramirez reviewed surveillance camera footage that showed employee Carmen Cotto distributing papers to employees, including Sonja Guzman. Pursuant to the 2001 no-solicitation, no-distribution policy, Cotto and Guzman both received verbal warnings. Cotto's was later rescinded when AdvancePierre realized it had enforced the wrong policy.

Next, on June 16, Ramirez was informed that Guzman and another employee—who Ramirez believed to be Diana Concepcion—had appeared on a Spanish radio station talk show two days earlier. Ramirez then accessed the radio

---

[1] The parties dispute whether AdvancePierre posted the sign, *compare* Resp't's Br. 6, *with* Pet'r's Br. 9, but there is no disagreement that the sign was in fact displayed.

station's Facebook page, where she noted that a link to the interview had been "liked" by a "Yazzmin Trujuillo." Not recognizing the name, Ramirez suspected Trujillo was, in fact, Concepcion. Ramirez decided to dig further and checked Concepcion's benefit file, which listed a beneficiary named "Trujillo" living at Concepcion's address. Based on this discovery, "Ramirez believed that there was a strong possibility that Concepcion was not who she said she was but was really someone named Yazzmin Trujillo." Pet'r's Br. 14. On June 17, Ramirez gave Concepcion a June 29 deadline by which to provide documentation of her identity. J.A. 646. In response, Concepcion submitted to Ramirez her Puerto Rican birth certificate, which the Company rejected because it was dated before July 10, 2010.[2] J.A. 648. AdvancePierre then informed Concepcion how she could obtain a new birth certificate, offered to pay for expedited shipping and extended the June 29 deadline to July 17. J.A. 648. When Concepcion did not reply by July 17, AdvancePierre suspended her indefinitely.[3] J.A. 719.

AdvancePierre also issued an "attendance point" to employee Jessenia Maldonado after she missed work to participate in a one-day strike.[4] When Maldonado called to

---

[2] AdvancePierre informed Concepcion that "[u]nfortunately, on July 10, 2010, Puerto Rico declared that all birth certificates issued prior to that date would be invalid since they had been used in the past to illegally obtain U.S. passports, Social Security benefits, and other federal services." J.A. 648.

[3] The Board does not seek enforcement of its order as it relates to Concepcion. Resp't's Br. 22, 26 n.6.

[4] AdvancePierre's policy permits employees to accumulate up to ten "occurrence points" in a rolling twelve-month period for "unexpected emergencies." J.A. 730. Failure to meet attendance standards can lead to progressive discipline up to and including

report her absence, she read from a Union-prepared script that stated: "I am not reporting to work today to protest the Company's unfair labor practices. I will unconditionally return to work on my next scheduled shift." J.A. 652. AdvancePierre concedes that Maldonado should not have received an attendance point but claims its error was an oversight, as none of the other striking employees received one. *See* Pet'r's Br. 16.

Before the 2015 Union organization drive, AdvancePierre lacked a written procedure to solicit or answer employee grievances, electing instead to maintain a suggestion box. In July 2015, Cincinnati Plant Manager Petra Sterwerf implemented a "new communication tool," J.A. 96, called Communicating Answers Tracking System (CATS) that she had previously used elsewhere, J.A. 97. Despite a self-imposed 48-hour deadline to respond to CATS submissions, AdvancePierre management refused to answer dozens of pro-Union CATS forms that were submitted in the weeks immediately after CATS was implemented.

The Company's final uncontested ULP occurred on August 27 when, in the context of announcing a new pay structure, it erroneously informed employees that "information about [employee] pay is considered personal and confidential and should not be shared with other associates." J.A. 680; *see Parexel Int'l, LLC*, 356 N.L.R.B. 516, 518 (2011) ("[O]ur precedents provide that restrictions on wage discussions are violations of [29 U.S.C. § 158(a)(1)]").

The only AdvancePierre ULP now before us happened between mid-May and mid-June 2015, when management notified employees how to withdraw a signed Union

termination. Following the parties' briefs, we use "attendance point" instead of "occurrence point."

authorization card. During several meetings, the Company distributed flyers containing step-by-step instructions, J.A. 624, and pre-printed letters that employees could send the Union to "revoke and rescind" their Union authorization cards, J.A. 625.[5] The flyer included this disclaimer: "Please understand that other than giving you this information, AdvancePierre Foods is not permitted by law to assist you in any other way in getting your card returned." J.A. 624. According to the Union, the combined effect of the meeting and flyers was to unlawfully solicit employees to withdraw their cards.

An Administrative Law Judge (ALJ) determined that AdvancePierre committed sixteen ULPs, in violation of section 8(a)(1) and (3) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1), (3). J.A. 101. But the ALJ concluded that AdvancePierre did *not* unlawfully solicit employees to withdraw their Union authorization cards because "[t]here was no attempt to require employees to inform management (indirectly or directly) whether they availed themselves of the opportunity" to withdraw the cards. J.A. 52. That is, the ALJ saw the Company's flyer as information—not a solicitation— and rejected the ULP charge because "[i]t has long been accepted by the Board that an employer's provision to employees of information on how to revoke their authorization cards is, without more, not unlawful assistance or solicitation." *Id.* (citing, *inter alia*, *R.L. White Co.*, 262 N.L.R.B. 575, 576 n.5 (1982)). The ALJ also denied the General Counsel's request for a notice-reading remedy because AdvancePierre's

---

[5] The flyer identified three steps: "1. Use the attached form to request in writing that you want your card back and are withdrawing your membership in the union. 2. Make a copy of the form and mail the original to the union address on the form. 3. Go to the union representative you gave the union authorization card to, and tell them that you want your card back." J.A. 624.

violations, although "by definition serious," did not rise to the level at which "traditional remedies are insufficient to redress the[ir] effects." J.A. 103. Both sides filed exceptions with the Board.

On review, the Board reversed the ALJ as to the solicitation ULP, finding that "contemporaneous serious [ULPs]—all related to the card-signing process and the organizing effort to select the Union as the employees' collective-bargaining representative—created an atmosphere where employees would tend to feel peril if they refrained from revoking their support for the Union." *AdvancePierre Foods, Inc.*, 366 N.L.R.B. No. 133, at \*4 (July 19, 2018). The Board also imposed the notice-reading remedy to "dissipate as much as possible any lingering effects of [AdvancePierre's] unfair labor practices, and . . . allow the employees to fully perceive that [AdvancePierre] and its managers are bound by the requirements of the Act." *Id.* at \*5 (citation and quotation marks omitted). Significantly, AdvancePierre did not seek reconsideration.

## B. Analysis

AdvancePierre asks us to deny enforcement of the solicitation ULP and the notice-reading remedy. The Board seeks to enforce its order, including summary enforcement of the uncontested portions. Resp't's Br. 2, 26. The Board had jurisdiction under 29 U.S.C. § 160(a). Our jurisdiction is under 29 U.S.C. § 160(e) and (f).

Our review of the solicitation ULP is "narrow and highly deferential." *Inova Health Sys. v. NLRB*, 795 F.3d 68, 73 (D.C. Cir. 2015) (citation and quotation marks omitted). We will uphold the Board's decision unless 1) its "factual findings are not supported by substantial evidence;" 2) it "acted arbitrarily;" or 3) it "otherwise erred in applying established law to the facts

of the case." *Hawaiian Dredging Constr. Co. v. NLRB*, 857 F.3d 877, 881 (D.C. Cir. 2017) (citation omitted). "The Board's discretion in fashioning remedies under the Act is extremely broad and subject to very limited judicial review." *Fallbrook Hosp. Corp. v. NLRB*, 785 F.3d 729, 738 (D.C. Cir. 2015) (quoting *St. Francis Fed'n of Nurses & Health Prof'ls v. NLRB*, 729 F.2d 844, 848 (D.C. Cir. 1984)).

Of critical importance to this case, section 10(e) of the Act limits our jurisdiction to matters first presented to the Board unless extraordinary circumstances excuse such failure. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); *see also, e.g.*, *Enter. Leasing Co. of Fla. v. NLRB*, 831 F.3d 534, 550 (D.C. Cir. 2016) ("Section 10(e) is a 'jurisdictional bar,' in the face of which we are 'powerless, in the absence of extraordinary circumstances, to consider arguments not made to the Board.'" (quoting *W & M Props. of Conn., Inc. v. NLRB*, 514 F.3d 1341, 1345 (D.C. Cir. 2008))). AdvancePierre's petition squarely collides with section 10(e)'s jurisdictional barrier and we are therefore without authority to consider all but a small portion the Company's argument.

We turn first to the Board's finding that AdvancePierre unlawfully solicited its employees to withdraw their Union authorization cards. Before us, AdvancePierre draws a sharp line between the flyer's unobjectionable content and the environment in which it was distributed, i.e., the Company's aggressive but misguided enforcement of its outdated no-solicitation, no-distribution policy. It argues that, because section 8(c) of the Act protects an employer's broad authority to express itself "if such expression contains no threat of reprisal or force or promise of benefit," 29 U.S.C. § 158(c), we

should not enforce the solicitation ULP as "the Board has failed to identify any statement, from the meetings or the flyer, that 'contains' any coercive element," Pet'r's Br. 54–55. In other words, the Company acknowledges that "the Board can—and did—punish the conduct that it views as creating a perilous atmosphere," *id.* at 55, but objects to the Board "double counting" that conduct and thereby "punishing protected speech as a method to impose a second punishment on other conduct," *id.* at 56. Regardless of its merit, we cannot consider this argument because it was not preserved under section 10(e).

In *In re Mohawk Industries*, 334 N.L.R.B. 1170 (2001), the Board made clear that an employer's otherwise protected speech can constitute unlawful coercion if it occurs within a perilous atmosphere created by contemporaneous ULPs:

> As a general rule, an employer may not solicit employees to revoke their authorization cards. An employer may, however, advise employees that they may revoke their authorization cards, so long as the employer neither offers assistance in doing so or seeks to monitor whether employees do so nor otherwise creates an atmosphere wherein employees would tend to feel peril in refraining from revoking. Thus, *an employer may not offer assistance to employees in revoking authorization cards in the context of other contemporaneous ULPs*.

*Id.* at 1171 (emphasis added) (alteration and citations omitted). At no point did the Company challenge *Mohawk* before the

Board.[6] Indeed, the Board majority, dissenting Member Emanuel and the ALJ all applied *Mohawk* but they reached different conclusions about whether AdvancePierre's conduct created a "perilous atmosphere." *Compare AdvancePierre*, 366 N.L.R.B. No. 133, at \*3–4, *with id.* at \*4 n.9, *and* J.A. 52–53. Because AdvancePierre's frontal attack on Board precedent was never made to the Board and extraordinary circumstances do not excuse its failure, we cannot reach this argument.[7] *See Camelot Terrace, Inc. v. NLRB*, 824 F.3d 1085, 1090 (D.C. Cir. 2016) ("In assessing forfeiture under section 10(e) of the Act, 'the critical question' is 'whether the Board received adequate notice of the basis for the objection.'" (quoting *Alwin Mfg. Co. v. NLRB*, 192 F.3d 133, 143 (D.C. Cir. 1999))).

Setting aside the direct challenge to *Mohawk*, all that remains of AdvancePierre's challenge to the solicitation ULP is whether the Board's application of *Mohawk* was arbitrary and capricious. *See* J.A. 573. Seizing on Member Emanuel's dissent, the Company argues that, under Board precedent, AdvancePierre's conduct was not "egregious" enough to create a "perilous atmosphere," Pet'r's Br. 58, and that "the Board had no support for its finding that AdvancePierre's conduct created

---

[6] AdvancePierre's Answering Brief to the Board made passing reference to the Company's right under section 8(c) to "present employees with an accurate and nonthreatening description" of how to revoke Union authorization cards. J.A. 572. But this did not put the Board on notice of a forthcoming challenge to *Mohawk*'s foundational premise, especially considering the Company's support of the ALJ's decision applying *Mohawk* in its favor. J.A. 573.

[7] AdvancePierre also contends that the Board's "approach of condemning neutral speech because of other conduct is . . . inconsistent with basic First Amendment principles." Pet'r's Br. 56 (citing *Schneider v. New Jersey*, 308 U.S. 147 (1939)). AdvancePierre did not raise this argument with the Board so we may not consider it either.

an atmosphere of peril so as to find that its provision of information regarding the union card revocation process was unlawful," *id.* at 59. We reject this argument because the Board's factual findings are supported by substantial evidence—i.e., AdvancePierre's many ULPs—and the Board did not act arbitrarily in applying its precedent. *See Hawaiian Dredging Constr. Co.*, 857 F.3d at 881; *see also ABM Onsite Servs.—West, Inc. v. NLRB*, 849 F.3d 1137, 1142 (D.C. Cir. 2017) ("[A]n agency's unexplained departure from precedent is arbitrary and capricious . . . .").

We next turn to AdvancePierre's challenge to the Board's notice-reading remedy. The Company faces an uphill climb because "the Board was acting at the 'zenith' of its discretion" when it "fashion[ed] an appropriate remedy to address the substantial unfair labor practices in this case." *Fallbrook Hosp. Corp.*, 785 F.3d at 738 (quoting *Niagara Mohawk Power Corp. v. Fed. Power Comm'n*, 379 F.2d 153, 159 (D.C. Cir. 1967)). Making the hill even steeper, AdvancePierre's argument is again limited by its failure to preserve the issue, primarily due to its failure to move for reconsideration before the Board.

Before us, AdvancePierre argues that a notice-reading is an "extraordinary" remedy, Pet'r's Br. 34, and that the Board's decision to impose it was arbitrary and capricious because it did not first explain why traditional remedies were insufficient, *see id.* ("A key factor the Board is required to consider when deciding to impose an extraordinary remedy is whether traditional remedies would be sufficient . . . ."). Citing *HTH Corp. v. NLRB*, 823 F.3d 668, 674 (D.C. Cir. 2016), AdvancePierre argues that "extraordinary remedies cannot be

granted unless traditional remedies are insufficient." Pet'r's Br. 36.[8]

Regarding preservation, the key distinction between this case and *HTH* is that, in *HTH*, the ALJ (not the Board) first imposed a notice-reading remedy, after which the company filed an exception to it. *HTH*, 823 F.3d at 672. In *HTH*, therefore, the Board heard argument against the notice-reading remedy but, here, the Board imposed the notice-reading remedy after the ALJ declined to do so. Although AdvancePierre argued to the Board that a notice reading was *inappropriate*, *see* J.A. 578–80, it did not argue that a notice-reading could not be imposed unless the sufficiency of traditional remedies was first considered and, because AdvancePierre did not move for reconsideration, the Board never heard this argument. Nor was the Company's omission based on extraordinary circumstances and, accordingly, we lack jurisdiction to evaluate this portion of the Board's reasoning.[9] *See Flying Food Grp., Inc. v. NLRB*, 471 F.3d 178, 185 (D.C. Cir. 2006) ("Where . . . a petitioner objects to a finding on an issue first raised in the decision of the Board rather than of the ALJ, the petitioner must file a petition for reconsideration with the Board to permit it to correct the error (if there was one).").

---

[8] The Company also relies on our decision in *Avecor, Inc. v. NLRB*, 931 F.2d 924 (D.C. Cir. 1991), in which we required a "comprehensive accounting" to support the Board's imposition of an *affirmative bargaining order* without considering "alternative remedies," *id.* at 938. *HTH* is more apposite because there we addressed a notice-reading remedy.

[9] Nor has AdvancePierre argued that the First Amendment requires heightened scrutiny of notice-reading remedies. Accordingly, we do not consider that argument.

Whether the Board abused its discretion when it ordered a notice-reading remedy is properly before us but easily resolved.[10] Notwithstanding that it can be "difficult to provide bright-line limits on the remedies that the Board can utilize," *United Food & Commercial Workers Int'l Union v. NLRB*, 852 F.2d 1344, 1349 (D.C. Cir. 1988), we have no trouble concluding that the Board did not abuse its "extremely broad" discretion, *Fallbrook Hosp. Corp.*, 785 F.3d at 738 (citation omitted), when it determined that AdvancePierre's seventeen ULPs were "sufficiently serious and widespread" to warrant a notice-reading.[11] *AdvancePierre Foods*, 366 N.L.R.B. No. 133, at *1 n.2.

For the foregoing reasons, we deny AdvancePierre's petition and grant the Board's cross-application for enforcement of those portions of its order that are before us. We summarily enforce the unchallenged portions of the Board's order. *See Allied Mech. Servs., Inc. v. NLRB*, 668 F.3d 758, 765 (D.C. Cir. 2012).

*So ordered.*

---

[10] In its Answering Brief to the Board, AdvancePierre argued that a notice-reading was "not [a]ppropriate." J.A. 578.

[11] AdvancePierre also argued that a notice-reading was unwarranted because the "official in question [Ramirez] was AdvancePierre's employee-relations manager, not its president or similarly high ranking official." Pet'r's Br. 46. Once again, we lack jurisdiction to consider this argument because it was not presented to the Board. *See Flying Food Grp.*, 471 F.3d at 185.