# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 6, 2022               Decided March 7, 2023

No. 21-1209

INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP
BUILDERS, BLACKSMITHS, FORGERS AND HELPERS, LOCAL
627,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

HAWAIIAN DREDGING CONSTRUCTION COMPANY, INC.,
INTERVENOR

———

On Petition for Review of an Order
of the National Labor Relations Board

———

*David A. Rosenfeld* argued the cause for petitioner. With
him on the briefs was *Michaela F. Posner*.

*Joel A. Heller*, Attorney, National Labor Relations Board,
argued the cause for respondent. With him on the brief were
*Jennifer A. Abruzzo*, General Counsel, *Ruth E. Burdick*, Deputy
Associate General Counsel, *David Habenstreit*, Assistant
General Counsel, and *Usha Dheenan*, Supervisory Attorney.

*Barry W. Marr* was on the brief for intervenor Hawaiian Dredging Construction Company, Inc. in support of respondent. *Megumi Sakae* entered an appearance.

Before: MILLETT, KATSAS and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WALKER.

WALKER, *Circuit Judge*: More than a decade ago, Hawaiian Dredging Construction Company and a Hawaiian chapter of the Boilermakers union failed to renew a collective bargaining agreement. Hawaiian Dredging then discharged Boilermakers welders who were covered by the now-expired agreement. The Boilermakers thought those discharges were an "unfair labor practice" under the National Labor Relations Act, 29 U.S.C. § 158(a), and asked the National Labor Relations Board to weigh in.

Originally, the Board sided with the Boilermakers. But Hawaiian Dredging asked this court to review that decision, and we remanded to the Board to reconsider.

The Board then changed its view and concluded that no unfair practice occurred. Now the Union takes its turn in petitioning us for review.

Because the Board's new decision was supported by substantial evidence and correctly applied established law, we deny the Union's petition.

3

I

A

Hawaiian Dredging is Hawaii's "largest general contractor." JA 1. To staff its construction jobs, it relies on union employees. According to officials at the company, it has a decades-old policy of performing craft work only when it has a "prehire" agreement with a union.

Unique to the construction industry, prehire agreements are collective bargaining agreements that permit a construction company to contract with a union before it hires any union workers. *See* 29 U.S.C. § 158(f); *NLRB v. Iron Workers*, 434 U.S. 335, 337-38 (1978). The union typically operates a "hiring hall" from which an employer may hire union workers on a project-by-project basis. *See, e.g.*, *Boilermakers Local No. 374 v. NLRB*, 852 F.2d 1353, 1355 (D.C. Cir. 1988).

Unlike a typical collective bargaining agreement, a prehire agreement is formed with a union that need not enjoy majority support from the employer's current employees. *See* 29 U.S.C. §§ 159(a), 158(f). As a result, construction employers are not required to bargain in good faith with a union after a prehire agreement expires. *See Iron Workers*, 434 U.S. at 345-46. Once a prehire agreement expires, either party can walk away.

For years, Hawaiian Dredging employed welders through a prehire agreement with the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers. When that agreement expired, the parties tried to reach a new deal. Hawaiian Dredging continued to employ its Boilermakers welders while it attempted to negotiate a new agreement, but negotiations stalled. Once it became clear that

the relationship between the parties had ended, Hawaiian Dredging suspended its welding projects and discharged thirteen Boilermakers welders.[1]

Hawaiian Dredging then entered a new prehire agreement with a different union, the United Plumbers and Pipefitters Union, Local 675.  Under this new agreement, Hawaiian Dredging offered the discharged Boilermakers welders a path back to employment.  If the welders met the Pipefitters' referral requirements — including a welding exam — they could go back to work for Hawaiian Dredging.  Eight of the thirteen welders eventually did just that.

The Boilermakers union disapproved of the way Hawaiian Dredging treated its welders.  It claimed that Hawaiian Dredging had discriminated against them for being Boilermakers.  But Hawaiian Dredging denies that.  It says the welders were fired because it had a neutral policy of employing craft workers only when it has a prehire agreement in place.

Unsatisfied with that explanation, the Boilermakers union took its case to the National Labor Relations Board, accusing Hawaiian Dredging of unfair labor practices under the National Labor Relations Act.  It alleged that Hawaiian Dredging's treatment of the welders violated §§ 8(a)(1) and 8(a)(3) of the Act.  *See* 29 U.S.C. §§ 158(a)(1), (a)(3), 157.

Section 8(a)(1) says employers cannot "interfere with, restrain, or coerce employees in the exercise of the rights

---

[1] Although the record suggests that Hawaiian Dredging may have fired fourteen welders, JA 362-75, the charge before the Board complained of only thirteen of those firings, JA 260-61. Accordingly, we discuss the thirteen employees relevant to the charge.

5

guaranteed" by the Act, 29 U.S.C. § 158(a)(1), including the right to form a union and collectively bargain, 29 U.S.C. § 157. Section 8(a)(3) says employers cannot "discourage membership in" a union. 29 U.S.C. § 158(a)(3). Taken together, those provisions make it unlawful to "discharge . . . a worker because of union activity." *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 394 (1983).

B

Initially, an Administrative Law Judge found that no unfair practice occurred. She reasoned that Hawaiian Dredging's asserted practice of staffing craft workers only when a prehire agreement is in place was "a legitimate business justification" for the discharges. *Hawaiian Dredging Construction Co.*, 362 NLRB 81, 104 (2015) (*Hawaiian Dredging I*).

The Board reviewed the ALJ's determination and reversed, with one member dissenting. *Id.* at 87-88. It found that Hawaiian Dredging could not rely on its asserted neutral policy because, on several occasions, it had continued to employ the Boilermakers welders after a prehire agreement expired and while negotiations for a new agreement were ongoing. *Id.* at 84.

This court reversed. We held that the Board gave "inappropriate emphasis to the gap periods" when Hawaiian Dredging continued to employ Boilermakers welders in the absence of a prehire agreement. *Hawaiian Dredging Construction Co. v. NLRB*, 857 F.3d 877, 884 (D.C. Cir. 2017). We noted that the Board failed to engage with the reasoning of the dissenting Board member, who argued that the short periods of continued employment could be explained by Hawaiian Dredging's "long history of bridging such hiatus

periods cooperatively" while negotiations with the union were ongoing. *Id.* (cleaned up).

On remand, the Board changed its view. It found that Hawaiian Dredging's actions were the result of a legitimate business practice — the company's prehire policy — and not anti-union discrimination. *Hawaiian Dredging Construction Co.*, 368 NLRB No. 7, at 6 (2019) (*Hawaiian Dredging II*).

The Boilermakers then petitioned us for review.

## II

Our review of Board decisions is deferential. "[W]e must uphold the judgment of the Board unless its findings are unsupported by substantial evidence, or it acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Wendt Corp. v. NLRB*, 26 F.4th 1002, 1008 (D.C. Cir. 2022) (cleaned up).

A Board decision is arbitrary if it "entirely failed to consider an important aspect of the problem or offered an explanation for its decision that runs counter to the evidence before" it. *Hawaiian Dredging Construction Co. v. NLRB*, 857 F.3d 877, 881 (D.C. Cir. 2017) (cleaned up). "Substantial evidence . . . is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Oak Harbor Freight Lines, Inc. v. NLRB*, 855 F.3d 436, 440 (D.C. Cir. 2017) (cleaned up).

## III

The Board concluded that Hawaiian Dredging did not commit an unfair labor practice when it discharged the Boilermakers welders because of a neutral, non-discriminatory

policy of only hiring welders under a prehire agreement with a union. Under our deferential standard of review, we deny the petition challenging that decision.[2]

A

When an employer fires an employee protected by the National Labor Relations Act, the Board may use one or both of two tests to decide whether anti-union motive explains the firing. *See* 29 U.S.C. §§ 158(a)(1), (a)(3), 157. Here, the Board applied both.

One test derives from the Board's decision in *Wright Line*, 251 NLRB 1083 (1980). Under *Wright Line*, the General Counsel of the Board (who prosecutes cases on behalf of the charging party) must make an initial showing that a discharge was the result of an anti-union motive. *Id.* at 1089; *see also NLRB v. Transportation Management Corp.*, 462 U.S. 393, 395 (1983). If he does, an employer can rebut that showing with a "legitimate business reason" for the discharge. *Wright Line*, 251 NLRB at 1088.

The other test derives from the Supreme Court's decision in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26 (1967). Under *Great Dane*, an anti-union motive can be inferred when an employer's action "is so inherently destructive of employee interests that it may be deemed proscribed without need for

---

[2] The Boilermakers raise a separate argument that Hawaiian Dredging violated § 8(a)(1) in a manner distinct from the discrimination covered by § 8(a)(3), *see* Petitioner's Br. 46-47, but we lack jurisdiction to address that argument because it was not raised to the Board on remand. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982) ("the Court of Appeals lacks jurisdiction to review objections that were not urged before the Board").

proof of an underlying improper motive." *Id.* at 33 (cleaned up). By contrast, actions that are "comparatively slight" infringements of employee interests do not give rise to that conclusive inference. *Id.* at 34 (cleaned up). Instead, an employer can rebut the charge of illegal discrimination by demonstrating "legitimate and substantial business justifications for" its action. *Id.* If it does so, the burden is on the General Counsel to prove an anti-union motive. *Id.*

Under both tests, the search for an anti-union motive is the touchstone of the analysis. If an anti-union motive cannot be inferred from "inherently destructive" conduct, then the General Counsel must prove that such a motive best explains the employer's action, rather than the legitimate business justification alleged by the employer.

B

Applying both *Wright Line* and *Great Dane*, the Board found that Hawaiian Dredging's discharges were not the result of an anti-union motive.

That conclusion rested on two findings. First, the Board found that Hawaiian Dredging's asserted policy — conditioning craft work on a prehire agreement — was "a legitimate and substantial business justification for the discharges." *Hawaiian Dredging II*, 368 NLRB No. 7, at 6 (2019). Second, it found that the discharges were the result of that policy, and not some discriminatory reason. *Id.* The General Counsel therefore failed to carry its burden under either test.

To start, we agree with the Board that Hawaiian Dredging demonstrated "a legitimate and substantial business justification for" discharging the welders. *Hawaiian*

*Dredging II*, 368 NLRB at 6. When a prehire agreement expires, a construction employer has no continuing obligation to maintain a bargaining relationship with a union. *See NLRB v. Iron Workers*, 434 U.S. 335, 345-46 (1978). So, absent other evidence, there is nothing discriminatory about a policy that suspends work and discharges all employees when an agreement expires. If anything, Hawaiian Dredging's policy promotes collective bargaining by ensuring that all of its welding work is done pursuant to a prehire agreement.

We also conclude that substantial evidence supports the Board's factual finding that Hawaiian Dredging discharged the welders because of its policy, and not for some discriminatory reason. Hawaiian Dredging officials gave uncontroverted testimony that it discharged the welders under the policy. *See Hawaiian Dredging I*, 362 NLRB 81, 104.

The Boilermakers point to evidence that they say cuts against the Board's conclusion. But each argument fails to persuade.

First, the Boilermakers point to short periods where Hawaiian Dredging continued to employ Boilermakers welders while no prehire agreement was in place. The Boilermakers allege that these gap periods show that Hawaiian Dredging's asserted policy is pretextual. But the Board reasonably found otherwise. As this court previously pointed out, Hawaiian Dredging has a "long history of bridging . . . hiatus periods cooperatively" by keeping union employees on the books while attempting to negotiate a new prehire agreement. *Hawaiian Dredging Construction Co. v. NLRB*, 857 F.3d 877, 884 (D.C. Cir. 2017) (quoting *Hawaiian Dredging I*, 362 NLRB at 95 n.33); *see also Hawaiian Dredging II*, 368 NLRB at 4 (incorporating this court's view into the Board's decision). That suggests the gap periods were not contrary to, but rather

consistent with, Hawaiian Dredging's longstanding policy and practice.

Second, the Boilermakers point to a letter they received from Hawaiian Dredging about the discharges. Hawaiian Dredging wrote that it did "not intend to utilize members of the Boilermaker's Union for future work." JA 360. The Boilermakers say that the letter shows an anti-union motive. But the Board concluded that the letter does not support that theory when it's read as a whole. *Hawaiian Dredging II*, 368 NLRB at 3-4. The letter explains that Hawaiian Dredging planned to end its relationship with the Boilermakers because its "prior agreement with the Union terminated." JA 360; *see also Hawaiian Dredging*, 857 F.3d at 885 (considering the letter in context). So again, the Boilermakers' evidence does not show discriminatory intent.

Finally, the Boilermakers argue that Hawaiian Dredging exhibited an anti-union motive when it *discharged* the welders — completely terminating their employment — instead of *laying them off* with the expectation of recall. According to the Boilermakers, the welders would have been able to return to work for Hawaiian Dredging more quickly had they been laid off instead of discharged. *Hawaiian Dredging II*, 368 NLRB at 5. However, given the context of Hawaiian Dredging's established policy of suspending all work in the absence of a prehire agreement, and the Board's factual finding that there was no 'practical difference' between laying the workers off and firing them, *see Hawaiian Dredging II*, 368 NLRB at 6 n.29, that choice between layoffs and discharges by itself does not evidence discriminatory animus. As we have explained, the question under *Wright Line* and *Great Dane* is whether an employer's action was due to an anti-union motive, not whether an employer's action adversely affected employees. As long as it does not discriminate, an employer

is free to decide between discharging and laying off its employees without violating §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act. That is so even when its decision might disadvantage employees.

\* \* \*

The Board's decision correctly applied established law and is supported by substantial evidence. We therefore deny the petition for review.

*So ordered.*